**UNITED STATES of America**

v.

**Anthony George BATTLE.**

**Criminal Action No. 1:95–CR–528–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 11, 1997.

William Louis McKinnon, Jr., Janice K. Jenkins, Office of United States Attorney, Atlanta, GA, for U.S.

Stephanie Ann Kearns, Federal Defender Program, John Richard Martin, Martin Brothers, Atlanta, GA, for Anthony George Battle.

## ORDER

ORINDA D. EVANS, District Judge.

This criminal case is before the court on Defendant's motion for judgment of acquittal, new trial and sentencing hearing, and correction or reduction of sentence. The government has responded. Having read and considered the motion, the supplement to the motion, and the parties' briefs, the court denies Defendant's motion.

Defendant, an inmate serving a life sentence for murder at the United States Penitentiary in Atlanta, Georgia (USP–Atlanta), was indicted in this case for murdering a prison guard, D'Antonio Washington. The indictment was brought under 18 U.S.C. § 1118, which provides that a federal inmate serving a term of life imprisonment who commits murder may be punished either by the death penalty or by life imprisonment. The case was tried to a jury during February and March, 1997. A guilty verdict was returned on March 12, 1997. At the penalty phase, the jury returned a death sentence which was pronounced by the court on March 20, 1997.

The trial evidence showed without dispute that Defendant approached Officer Washington from behind in an open cell block area and inflicted mortal wounds to Washington's head with multiple blows of a hammer.

Defendant presented an insanity defense and also argued that the evidence was insufficient to prove his guilt beyond a reasonable doubt. During his trial testimony, Defendant admitted committing the murder. Defendant testified that while he emphatically believes he is not schizophrenic, he has implants in his body which monitor his thoughts and cause him physical pain and he constantly hears voices which curse him and harass him. He testified that he believes that the government placed the implants in his body; that the government is the cause of the voices; and that these problems began in 1991, when he was at FCI–Leavenworth.

He testified essentially that Washington's murder was intended to stop the government from tormenting him. The defense pointed out that in Defendant's 1987 evaluation at FCI–Butner, government psychiatrists had determined that the Defendant had a personality disorder with paranoid and schizotypal features. At that time they noted this could be a prodromal phase of schizophrenia. Defendant's expert witnesses testified that he suffers from paranoid schizophrenia; the defense argued that the disease had rendered the Defendant unable to understand the nature and quality of his acts or appreciate the wrongfulness of his conduct on the day of the murder, December 21, 1994.

The government's expert witnesses testified that the Defendant has had a history of behavioral and psychological problems, but opined that the correct diagnosis is "personality disorder with paranoid, schizotypal, and antisocial features." (Tr. Vol. 14, at 2999). The government argued that Defendant's statements to government and defense psychologists and psychiatrists regarding the implants and the voices were contrived in an effort to establish an insanity defense, and that Defendant only began reporting these symptoms considerably after Washington's murder. The government presented evidence of Defendant's statements and actions immediately prior to the murder, urging that these indicated a degree of planning and awareness of wrongfulness incompatible with an insanity defense. The government also pointed out that 1996 administrations of the Minnesota Multiphasic Personality Inventory by both defense and government psychologists did not show clinical elevation of the schizophrenia or paranoia scales, and that the results were valid according to the test's own validity scales.

At the sentencing hearing phase, the government's evidence showed that on April 25, 1995, the Defendant, while in handcuffs, attacked one of four guards who had entered his cell in the segregation unit at FCI–Leavenworth to place leg irons on him prior to taking him to an attorney conference. Defendant used a sharp pointed object, inflicting minor stab wounds, and also struck blows to the guard's body after the guard had

fallen to the floor. In addition, the government's evidence showed that on December 30, 1996, while incarcerated at the Paulding County Jail (awaiting his February 1997 trial in the instant case), the Defendant forced his way out of his cell while it was being cleaned, chased the guard down the hall, and attacked and beat him on his face and chest. Defendant testified at the sentencing hearing and said, essentially, that Officer Washington had deserved to die.

Defendant first argues that he is entitled to a new sentencing hearing based on insufficient voir dire and improper rulings on challenges for cause.

Before turning to the specifics of Defendant's argument, the court will first set out the manner in which voir dire proceeded in this case. First, prior to trial counsel for both sides submitted proposed juror questionnaires. The court prepared a questionnaire drawing on the proposed questionnaires submitted by both sides. Counsel were provided a copy of the final version of the questionnaire in advance of trial. On the day the jurors reported for jury selection, each prospective juror was required to fill out a questionnaire. A sample of the questionnaire is attached hereto as Exhibit A.

The initial portion of the questionnaire gave the jury some information concerning the case. It stated that the Defendant was charged with killing a prison guard while serving a life sentence. It stated that an insanity defense might be presented and that if the penalty phase was reached, evidence concerning the Defendant's mental condition would be presented. The jury was informed that if the Defendant were found guilty, the case would move to a penalty phase wherein the jury would make the determination as to whether or not the death penalty should be imposed. Thus, before responding to the questionnaire and before the oral questioning began, the jurors knew not only that the Defendant was charged with murder, but also had more specific contextual information. They also knew that there would be psychiatric evidence which might be offered as a defense or in any event in mitigation of the penalty and that the jury would be determining the sentence, with the death penalty being one option.

The oral questioning began with questions by counsel for both sides after each prospective juror had stated certain basic information (name, city and county of residence, occupation, name of company employed by, position held prior to retirement if applicable, plus spouse's occupation if applicable). At this point, counsel's questions were limited to details of occupation, plus spouse's occupation if applicable.

Following that, copies of the completed juror questionnaires were distributed to counsel. After counsel had had an opportunity to review the questionnaires, each prospective juror was called into the courtroom individually for questioning. The views of counsel were solicited as to what questions they believed would be appropriate for each juror. In all cases where a juror had indicated that he/she would "automatically vote in favor of the death penalty" or "automatically vote against the death penalty", the court and counsel asked questions to verify that the juror understood the question and meant what he/she said. Also, all of those jurors who responded that if the jury had to determine whether or not the death penalty should be imposed, "I would make my decision based on consideration of the evidence in this particular case, including aggravating or mitigating circumstances, and in accordance with the Court's instructions in the law", but who had also stated strong support for the death penalty were questioned by the Court and in many instances by counsel to verify that they indeed could act as fair impartial fact-finders. After each juror had been questioned, counsel had an opportunity to move to challenge the juror for cause outside the juror's presence.

The court also conducted general voir dire questioning of prospective jurors as a group. These questions were largely drawn from lists of proposed questions filed by both sides. In some instances, counsel asked follow-up questions.

■ Defendant first asserts that prospective jurors Lindsay and Parker were insufficiently questioned as to their anti-death penalty views and that they were improperly excused for cause.

Juror Lindsay stated in his questionnaire that if the Defendant was convicted of murder without justification, that he would automatically vote against the death penalty. He also checked the "Yes, definitely" option in response to the question: Would you favor abolishing the death penalty? In response to another question on the questionnaire, he checked a block indicating "the death penalty should be abolished because it is wrong". In response to another question, he selected the option indicating that he "could not support the death penalty in any case", in lieu of the other option which was "might sometimes support the death penalty in the most horrible cases". Finally, in response to a question as to what reasons justified the death penalty, Lindsay checked the option "there is no good reason for the death penalty". The relevant portion of Lindsay's individual oral questioning is as follows:

The Court: Could you just tell us again verbally how you feel about the death penalty?

Juror Lindsay: I am adamantly opposed to murder, any kind of murder, either by an individual or collectively by us as a group. I'm adamantly opposed to murder, and I consider the death penalty murder.

The Court: Let me tell you this: we are not necessarily looking for jurors who are in favor of the death penalty. That's not important. It's not required. What is required is somebody that can take a good look at the facts of our particular case, listen to the evidence, try to figure out what really happened in this case, try to get as much information as you can about the defendant, and then if we do get to the part of the trial where the penalty is at issue, we are looking for jurors who can look at the different options and weigh them fairly.

Could you consider the various options; in other words, for example, consider the option of a life sentence versus the death penalty?

Juror Lindsay: I could consider anything except the death penalty. That for me is out. As a matter of fact, I have a living will with my wife that if someone were to kill me, that I would not want that person to experience the death penalty. I'm adamantly opposed to it.

The Court: What about the possibility, and I don't know what the evidence is going to show, and I don't mean to suggest to you what the evidence is going to be, but I mean what if you sat as a juror, and we get to the death penalty phase of the trial, and the evidence is just, you know, really overwhelming and gut wrenching. Could you possibly consider imposing the death penalty if the evidence is just really bad?

Juror Lindsay: I reiterate what I said. My wife and I have an agreement. I love my wife. I love my wife more than I love me. If someone were to kill my wife and it were to get to court to the point of the death penalty, I would, in fact, voice an opinion that I do not want that person put to death. I'm adamantly opposed to murder whatever the issues. I'm adamantly opposed.

The Court: Can you think of any circumstance under which you as a juror would be able to vote for the death penalty?

Juror Lindsay: Absolutely not. Absolutely not. Absolutely not.

The Court: Thank you. Step out in the hall, and we will let you know something in a minute.

(Tr. Vol. 2, at 147–49).

The government moved to excuse Lindsay for cause and the defense objected. The motion was granted. The defense contended that the court should have asked the following question:

You understand that sometimes you have to apply laws you don't believe in, and that is your duty as a juror. Could you, if the court instructed you, and you took an oath to apply the law, even if you disagreed with it, could you comply with the court's instructions?

(Tr. Vol. 2, at 150).

On her questionnaire, juror Parker checked the block "I would automatically vote against the death penalty" in response to the question as to how she would proceed at a sentencing phase if the defendant were convicted of murder without legal justification. In an apparent contradiction, she

checked the "not sure" space in response to the question "Would you favor abolishing the death penalty"; but on the next question, which was "Which of the following describes your attitude toward the death penalty? (you can check as many or as few as apply to you)", she selected the block "the death penalty should be abolished because it is wrong" and added a handwritten comment "Yes I'm [sic] say this by the Bible which says thou shell [sic] not kill." Finally, she checked "There is no good reason for the death penalty" in response to the question "What reasons justify the death penalty". The following individual voir dire of juror Parker as to death penalty views took place:

The Court: All right. Now, let me change the subject for just a minute. When you filled out your questionnaire yesterday, you were asked some questions about how you feel about the death penalty.

Juror Parker: Uh-huh.

The Court: Would you just tell us again verbally what your feelings are about the death penalty?

Juror Parker: I do not believe in the death penalty. First, I'm a Christian, and I believe in God who said that you shall not kill, and that's for me and for anybody else. Now, that's what I believe.

The Court: Now, what we are looking for in this case is not necessarily people who are in favor of the death penalty. You do not have to be in favor of the death penalty to be on our jury, but it has to be one of the things that you could consider if you thought the facts of the case were really bad, and if we get to the penalty phase of the trial, which we might or we might not, but if we got to that phase of the trial, the question is would you be able to listen to the evidence and follow the court's instructions on the law, part of the instruction being that you should consider the aggravating and mitigating circumstances, and then pick the penalty that is right for this particular case? In other words, we need people who can keep an open mind and consider the death penalty as just one possibility. Is it a possibility that you could consider? You need to answer out loud?

Juror Parker: I don't think so.

The Court: Okay. Mr. Martin, do you want to ask any questions?

Mr. Martin: Yes, Ma'am.

### EXAMINATION

By Mr. Martin:

Q. Ms. Parker, you understand it is important that we have jurors representing all the community, do you not?

A. Yes.

Q. And you also understand there are occasions when we have to obey a law which we might not agree with?

A. Yes.

Q. You understand that?

A. Yes.

Q. And you understand that no court or no juror would ever be required under the law to impose the death penalty. The only think we are asking is whether or not you can consider it as a possibility. Do you understand that?

A. Yes.

Q. Now, if you took an oath as a juror to apply the law, and the court instructed you that one of the things that the law requires you to do is to give consideration to the death penalty along with all the other factors in this case, the good and the bad, do you think you could temporarily set aside your opinions and try to do your duty as a juror in conformance with the law? I don't mean you give up your opposition to the death penalty, but just the ability to consider it as an option in this case?

A. I'm I sure I could consider it.

Mr. Martin: Your Honor, that's all I have.

### EXAMINATION

By Mr. McKinnon:

Q. Ms. Parker, you have to be able to do more than consider it. You have to be able to listen to the instructions that the judge would give you about what you should consider in deciding whether you should impose the death penalty or some lesser penalty. Can you listen to the Judge's instruction and follow these instructions even though you personally dis-

agree with giving the state the power to impose the death penalty in a particular case?

A. Sure, I can listen to the Judge.

Q. And if the Judge tells you that you have to consider certain factors about the defendant's background and about the characteristics of the crime, and if you find those factors to be present that you may impose the death penalty, can you listen to those instructions and follow that instruction and say yes, I can impose the death penalty if those factors are proven here?

A. I could go along with it.

The Court: I'm sorry. I can't hear you.

Juror Parker: I said I'm sure I can go along with that.

By Mr. McKinnon:

Q. And can you come back into this courtroom, look at this man, and say, yes, I'm one of the jurors who voted in favor of imposing the death penalty in this case?

Mr. Martin: Your Honor, I would object to that question.

The Court: Overruled.

Juror Parker: Repeat it.

By Mr. McKinnon:

Q. If the jury unanimously concludes that it would impose the death penalty, and that is done back in the jury room outside the presence of the lawyers and the judge and the defendant, but then you come back in and publish your verdict and say out loud that you are imposing the death penalty as a body of 12 people, then you may be asked individually to state in the courtroom looking at the defendant with him present that you voted in favor of the death penalty in this particular case. Could you do that?

A. I don't know if I can do that or not.

The Court: I couldn't hear you, ma'am.

Juror Parker: I don't think I could do that.

The Court: Well, I want you to understand that, or course, my job is to give instructions to the jury. That's part of what I do, but I will not be telling the jury what to do. If we get to that penalty phase, I'm not going to be saying you do this or you do that. I'm going to be giving out sort of guideline instructions saying here are the sorts of things you should consider. It is going to be up to the jury ultimately to decide what to do. If the evidence was just—and I don't know what the evidence is going to be in this case really, but let's suppose the evidence was just really bad. I mean it just really looked like a horrible, horrible crime. If that were to happen, could you vote in favor of the death penalty?

Juror Parker: No, ma'am. I could not.

The Court: Okay. Step out in the hall, and we will let you know something in just a minute.

(Juror Parker excused from the courtroom).

After juror Parker left the courtroom, the following colloquy occurred:

The court: I think that Mrs. Parker's hardship excuse is meritorious, quite frankly, and I also think she is disqualified. I do not think that she could vote in favor of the death penalty.

I would also like to observe that I don't think these questions about following the instructions of the court are going to cut it. I think the questions are too confusing to the jurors. It puts them in a position of saying no, I don't think I could follow the instructions of the court, which they are not prone to do. I think we have to go at it a slightly different way.

Mr. Martin: Your Honor, may I respond to that?

The Court: Yes.

Mr. Martin: The reason that you have to go at it that way is because *Wainwright v. Witt* says that the standard is would their views on capital punishment, quote, prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.

What *Witt* made clear was that jurors who are opposed to the death penalty, and, of course, *Lockhart v. McCree* said this as well, who are violently opposed to the death penalty are still qualified as jurors as long as they can say we will follow the court's instructions, and we will set aside our personal belief in deference to the rule

of law. That's what I'm trying to get at with these jurors.

(Tr. Vol. 2, at 156–57).

Juror Parker was excused.

■ While it is true that *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) states that jurors opposed to the death penalty may serve "so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law," *id.* at 176, 106 S.Ct. at 1766, nothing in *Lockhart* requires that particular words be used in making this inquiry. The basic idea is that a juror who is ideologically opposed to the death penalty, but who could nonetheless impose the death penalty if this were shown to be appropriate by the facts and law in a particular case, is not disqualified. The court was convinced that neither juror could vote for the death penalty, regardless of the evidence, and that neither could give fair and impartial consideration to the death penalty as an option, consistent with the court's instructions to consider aggravating and mitigating circumstances.

■ The question sought by defense counsel "Could you set aside your beliefs and follow the court's instructions", while meaningful to judges and lawyers, is ambiguous and possibly misleading to a layperson. A prospective juror may not know to what "instructions" the question is referring and may be reluctant to state unwillingness to follow the law or the court's instructions. Also, some jurors are more prone to feeling pressured and confused by leading voir dire questions than others. Juror Parker's voir dire illustrates this.

■ Defendant next argues that the court conducted insufficient voir dire of certain prospective jurors who favored the death penalty, and with respect to those the defense challenged for cause, improperly declined to excuse them for cause. Defendant asserts that "the voir dire was insufficient to determine whether or not the views of the juror were sufficiently dogmatic that the juror should have been disqualified for cause, because he or she was substantially impaired from being able to follow this court's instruction concerning the consideration and weighing of mitigating circumstances." (Supple-

ment to Motion for Judgment of Acquittal, New Trial and Sentencing Hearing, and Correction or Reduction of Sentence with Incorporated Authority, filed June 2, 1997, at 4).

The prospective jurors included within this argument are jurors Youmans, Heard, Brown, Jeffares, Alexander, Belcher, Moore, Foil, Adams–Conner, Falany, Fields, Rudisill, Cody, Cobb, Jackson, and Gravett. All of these jurors except Fields and Gravett had stated on their questionnaires that they "very strongly" favored the death penalty, but all had indicated that if the penalty phase were reached, "I would make my decision based on consideration of the evidence in this particular case, including evidence of aggravating or mitigating circumstances, and in accordance with the court's instructions on the law." Fields had indicated that he was "somewhat strongly" in favor of the death penalty; in response to another question, he had also checked a block "The death penalty should probably be imposed more frequently than it is." Gravett had stated he was "somewhat strongly" in favor of the death penalty, but that he definitely did not think it should be abolished. The court conducted individual oral voir dire as to each of these jurors' views concerning the death penalty. The defense moved to excuse for cause all of the referenced jurors except for jurors Belcher and Youmans, as to whom there was no motion. Of this group, jurors Belcher and Fields were selected for the jury. (Tr. Vol. 4, at 647, 700–01).

Defendant's legal argument concerning insufficiency of voir dire as to these jurors is based on a combined interpretation of two Supreme Court decisions, *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). In *Witt*, the Supreme Court held that a juror with anti-death penalty views was properly excused for cause where her views would prevent or "substantially impair" the performance of her duties as a juror. In *Morgan*, the Supreme Court held that the trial court's refusal to inquire of prospective jurors in a capital case whether they would automatically vote for the death penalty if the defendant were found guilty violates due process. De-

fendant therefore asserts that his due process rights were violated because he was unable to determine whether jurors who supported the death penalty were "substantially impaired".

The scope of Defendant's argument is somewhat ambiguous. Defendant appears to argue that those jurors who indicated that they would be able to make a decision as to whether or not to impose the death penalty "based on consideration of the evidence in this particular case, including evidence of aggravating or mitigating circumstances, and in accordance with the court's instructions on the law", but who also indicated strong support of the death penalty, should have been questioned more extensively than they were to determine whether such jurors were "substantially impaired" so as to disqualify them from jury service. Defendant may also be arguing that any juror who supports the death penalty "very strongly" is *per se* substantially impaired and must be stricken on a challenge for cause.

The relevant portions of the individual oral questioning of each of the referenced jurors is as follows:

### Juror Youmans

The Court: I wanted to ask you a few more questions following up on your questionnaire answers.

Juror Youmans: All right.

The Court: You indicated that you are strongly in favor of the death penalty. Now, of course, in this case that will not become an issue unless and until the Defendant is found guilty. If he is found guilty, however, that jury is going to have to decide what penalty applies in this case, and we, of course, are looking for jurors who can do that in a fair and impartial way.

I anticipate that if we get to that part of the trial, that the government is going to be presenting evidence of what is called aggravating circumstances, and the defense is going to be presenting evidence of mitigating circumstances.

Now, keeping in mind that we won't even get to that point unless the jury first finds that there was a premeditated murder, okay, and given the fact that you say you are strongly in favor of the death penalty, how comfortable are you in saying, or could you say that options other than the death penalty would be a live option for you at that point, another option being life in prison without parole?

Juror Youmans: I have no problem with that. The question wasn't presented any other way with any other circumstances other than how do you feel about the death penalty. So, the way I perceived it, I've got to answer it honestly, but by the same token, I would view everything that was presented, or whatever, and then make a determination based on that. Just simply because I feel strongly for the death penalty doesn't mean that that's my only option for any decision that I might make. Does that make sense to you?

The Court: Yes. So, do you think you could give fair consideration to the evidence and make an impartial determination if we get to that part of the case?

Juror Youmans: Certainly. Certainly.

(Tr. Vol. 3, at 548–49).

### Juror Heard

The Court: .... I wanted to ask you a couple of questions regarding your views on the death penalty. The first thing the jury is going to do in this case is determine whether the Defendant is guilty or not guilty. If the Defendant is found guilty, there will be a second separate sentencing phase, and at that time each side has the opportunity to present additional evidence.

Based on what the lawyers have told me, I anticipate that at that time the government will put on some evidence of what it considers to be aggravating circumstances, things that suggest that the death penalty should be imposed. It is also my understanding that the defense will present evidence which it considers mitigating in nature, and which would point more towards a term of life imprisonment. I further anticipate that the evidence presented by both sides is going to be sharply disputed.

If we get to that point in the trial, I will be instructing the jury that it should give careful consideration to the evidence presented by both sides, and that the jury

should determine based on consideration of all of the evidence whether the death penalty or another penalty should be imposed.

I notice that you indicated in your questionnaire that you very strongly favor the death penalty. In light of that, what is the degree of your confidence that you can give fair consideration to all of the evidence that is presented and make a fair choice as to the appropriate penalty in this case?

Juror Heard: Well, I think if the crime is of a malicious nature, as you just spoke of, and the death penalty is justified in such a case, I would have no problem whatsoever with it. The evidence would have to be overwhelming, I would think, for me to vote for the death sentence. I would be strictly on what was said as far as the evidence is concerned.

The Court: Okay. So, at this point is it fair to say that you have an open mind as to what you would do if we get to that penalty phase?

Juror Heard: Yes.

The Court: Can you keep an open mind and make a decision based on the evidence you hear?

Juror Heard: Most definitely.

The Court: All right. Thank you. Would you please go on up to the jury assembly room, and we will be with you as soon as possible.

(Tr. Vol. 3, at 412–14).

### Juror Brown

The Court: Okay. Also on your questionnaire you indicated you were very strongly in favor of the death penalty. Now, this case is going to first be a trial of the guilt/innocence issue. If the Defendant is found not guilty, of course, there won't be any penalty phase of the trial, but if he is found guilty, we will then have to move into the penalty phase, and I anticipate that at that time both sides will be presenting evidence that they think is relevant.

The government will be presenting evidence that they consider is aggravating in nature, that they feel would make the death penalty the right penalty. The defense, on the other hand, will be presenting evidence in mitigation, evidence which they feel would make the death penalty not appropriate, that would point more towards a sentence of life imprisonment, and I anticipate that both sides' evidence is going to be conflicting. The jury is going to have to decide what the real facts are.

If you were on the jury, and if we get to that penalty phase, can you fairly and impartially consider the evidence presented by both sides, and make a fair determination as to whether the death penalty should be imposed, or life imprisonment should be imposed, or do you feel like you would be pretty much pointed toward one outcome or the other?

Juror Brown: I think I could make a fair judgment in the individual case from the evidence.

The Court: okay. Thank you. You may go up to the jury assembly room, and we will be with you as soon as we can.

(Tr. Vol. 3, at 430–31).

### Juror Jeffares

The Court: You indicated in your questionnaire that you very strongly favor the death penalty.

Juror Jeffares: Yes, I do.

The Court: The jury that is selected in this case will first have to make a decision as to whether the Defendant is guilty or not guilty. Of course, if he is found not guilty, that will end the case. If he is found guilty, we will go on to the penalty phase of the case, and at that time it appears to me that both sides will be presenting evidence.

The government will be presenting the evidence that it considers to be aggravating in nature, things that tend to suggest that the death penalty should be imposed. The defense will be presenting evidence mitigating in nature, evidence that they believe will show that the death penalty would not be appropriate in this case, and that some other sentence; for example, life imprisonment might be the right sentence.

It appears to me that both sides' evidence is going to be contradicted by the other side. The jury is going to have to decide that the true facts are, and make a

determination as to what penalty should be imposed.

If you are picked for the jury, can you listen to all of the evidence and give fair consideration to both of the penalty options that are presented in this case, or do you think your feelings about the death penalty would tend to make you predisposed toward one outcome rather than the other?

Juror Jeffares: I believe I can listen to the evidence and make a decision based on that.

The Court: Can you make a decision that is fair to both sides?

Juror Jeffares: Yes, I believe I could.

The Court: okay. You may go on up to the jury assembly room, and we will be with you as soon as we can.

(Tr. Vol. 3, at 434–35).

### Juror Alexander

The Court: You indicated that you were strongly in favor of the death penalty.

Juror Alexander: Yes.

The Court: I want to ask you this question: If we get to the penalty phase of the trial—of course, if the Defendant is found not guilty at the initial phase, that would end it, but if he is found guilty and we go on to the penalty phase of the trial, each side will have a chance to present additional evidence. Based on what the lawyers have told me, I believe the government is going to present evidence that they consider aggravating in nature, evidence that would tend to point toward the death penalty. The defense on the other hand has indicated that they intend to present mitigating evidence, evidence that would point away from the death penalty and toward the imposition of some other penalty; for example, life in prison; there will be disputes as to each sides' evidence. None of it will be undisputed, I don't believe. So, the jury will have to decide what evidence to credit during the penalty phase.

If you were on the jury, could you carefully consider the evidence presented by both sides and make a fair determination as to which penalty should be imposed, or do you feel like you are pretty well pointed toward one out come or the other such that it would be hard for you to fairly consider the options?

Juror Alexander: I think I can be fair even though, like I said, I definitely am in favor of the death penalty.

The Court: Right.

Juror Alexander: But, yeah, I could be fair with the information given to me.

The Court: Right. It's not a problem if a juror either favors or disfavors the death penalty. I mean everybody has got a point of view, but we must have jurors who could return either verdict at the penalty phase.

Juror Alexander: I could.

The Court: And who have the ability to fairly consider all of the options, and not tend to screen one out because of some predisposition, if you understand what I'm saying.

Juror Alexander: Yes, I could do that.

The Court: All right. Thank you. You are excused for lunch until 1:15. Please be back in the jury assembly room at 1:15.

(Tr. Vol. 3, at 464–66).

### Juror Belcher

The Court: You indicated that you are very strongly in favor of the death penalty, and that causes me to ask you some more questions.

Juror Belcher: Okay.

The Court: If you are picked for the jury in this case, the first thing that you will need to do is determine whether the Defendant has been proven guilty, or whether, on the other hand, he is not guilty. If he is found not guilty, that will end everything, but if he is found guilty, we will go on to the penalty phase of the trial.

At that time the government will be presenting evidence that they consider is aggravating in nature, evidence that they contend points toward the imposition of the death penalty. The defense, on the other hand, will be presenting evidence that they consider mitigating in nature, evidence that would point away from the death penalty and toward the imposition of another penalty; for example, one possibility would be life in prison without parole.

The jury will be asked to consider the evidence presented by both sides. There will probably be a lot of conflicts in the evidence. The jury will have to decide what the true facts are.

If you were picked for the jury, could you give fair consideration to the various penalty options that will be presented to the jury, or do you feel you are already pretty well pointed in one direction as far as what penalty should be imposed?

Juror Belcher: I can be fair.

The Court: And do you have an open mind as to what penalty you would pick in this case?

Juror Belcher: Yes.

The Court: And is it fair to say that you won't shut out consideration of any of the options?

Juror Belcher: Yes.

The Court: Can you keep an open mind until all of the evidence is presented?

Juror Belcher: Yes, Ma'am.

The Court: Okay. You are excused for lunch until 1:30. Please be back in the jury assembly room at that time.

(Tr. Vol. 3, at 475–77).

### Juror Moore

The court: In answering your questionnaire, you indicated essentially that you favor the death penalty only in certain very limited cases.

Juror Moore: Yes.

The Court: Is that correct?

Juror Moore: Uh-huh.

The Court: And what I want to ask you is if we do get to the death penalty phase, I think there is going to be evidence put on by both sides. The government will be putting in evidence that they think is aggravating in nature which tends to suggest the death penalty, but the Defendant will be putting in mitigating evidence, evidence that would tend to suggest that the death penalty should not be imposed, but rather some other penalty. Would you be able to consider both the aggravating and the mitigating evidence and make a fair decision between the penalty options that are available in this case?

Juror Moore: I believe I probably could.

The Court: Well, how sure are you?

Juror Moore: I'm very sure.

The Court: Okay. Okay. Thank you. You are excused for lunch until 1:30.

(Tr. Vol. 3, at 479–80).

### Juror Foil

The Court: Mr. Foil, in your jury questionnaire you indicated that you favored the death penalty very strongly.

Juror Foil: Right.

The Court: So, I want to ask you some more questions.

Juror Foil: Okay.

The Court: My question is this: If you are picked for the jury, and if we get to the stage of the trial where the penalty has to be decided, I anticipate that the government is going to present evidence of what it considers to be aggravating circumstances, circumstances which the government contends point toward the death penalty, and the defense on the other hand is going to be presenting mitigating evidence, evidence which they feel tends to indicate that the death penalty should not be imposed, and that the jury should pick another option, perhaps, for example, life in prison without parole. The evidence presented by both sides may very well be contradicted by the other side. The jury is going to have to decide what the true facts are.

If you are on the jury, and if we get to the penalty phase, could you give fair consideration to both the aggravating and mitigating evidence presented by both sides, and make a fair choice between the various penalty options, or on the other hand, do you feel like you would be pretty well pointed toward one outcome rather than the other without consideration of the evidence?

Juror Foil: I don't believe I would have any problem taking all the information into consideration.

The Court: And do you feel at this point that you have an open mind as to the various options?

Juror Foil: Yes, ma'am.

The Court: All right. Thank you. You are excused for lunch until 1:30. Please be in the jury assembly room at that time. (Tr. Vol. 3, at 482–83).

### Juror Adams–Connor

The Court: If this case gets to the penalty phase, if the Defendant is found guilty—

Juror Adams–Connor: Yes, ma'am.

The Court: The jury is going to have to make the decision as to whether the death penalty should be imposed, or whether another penalty; for example, life in prison without parole should be imposed.

To assist the jury in making its decision, the parties will be presenting additional evidence at the penalty phase. The government will be presenting evidence which it considers to be aggravating in nature. The defense will be presenting evidence which it considers to be mitigating in nature. Based on the consideration of the evidence, the jury will need to choose the appropriate penalty option. Now, I noticed when you answered your questionnaire, you indicated that you strongly favor the death penalty.

Juror Adams–Connor: I do.

The Court: You said, "I favor the death penalty strongly for certain heinous crimes and/or premeditated."

Juror Adams–Connor: Correct.

The Court: So, what I want to know is if you were picked for the jury, could you keep an open mind and listen to all of the evidence, whether it be aggravating or mitigating evidence, and make a fair choice as to what penalty should be imposed in this case?

Juror Adams–Connor: Yes.

The Court: Do you feel like in light of the fact that you strongly favor the death penalty, do you think that you are already kind of pointed in that direction, or do you think you have an open mind?

Juror Adams–Connor: I would have to think very hard before I voted to take someone's life. So, even though I'm very much in favor of the death penalty, it would have to be—I would have to have the evidence, and, you know, in other words, I favor like Ted Bundy's death penalty, things like that that are just so open and shut on crime sprees and stuff like that. I wouldn't go into the courtroom thinking well, this person is going to get the death penalty, you know, in my mind. First of all, I would have to know the law and what is recommended in that particular situation.

The Court: You are excused for lunch until 1:45. Please be in the jury assembly room at that time.

(Tr. Vol. 3, at 490–91).

### Juror Falany

The Court: If you were picked for the jury in our case, could you make a decision based only on the evidence you hear in court?

Juror Falany: I think so.

The Court: What is the degree of your certainty?

Juror Falany: Certain people have definite feelings about capital punishment. Unlike most people in my particular degreed profession, I have a very conservative view about capital punishment from the stance that although I'm aware of the literature in the area as far as its use as a deterrent, I am thoroughly convinced that there are times when it should be imposed, and I feel very strongly about that, and I have actually conducted discussions on a college campus where I took that position.

The Court: Well, we are looking for jurors who can, if we get to the penalty part of the case—of course, if the Defendant is found not guilty, we won't get there, but if we do, we are looking for jurors who can fairly consider the different penalty options. We don't want people who say it's going to be the death penalty for sure, or people who say I would never return the death penalty. We are looking for people who have an open mind.

What is going to happen at the death penalty phase, if we get there, is that the government is going to be presenting evidence that they consider is aggravating in nature. The defense is going to be presenting mitigating evidence, evidence that they contend would indicate that the death penalty should not be imposed, but instead another option should be chosen, one possi-

bility being life in prison without parole. okay? and we are looking for jurors that could come to that part of the trial with an open mind and make a fair choice between the options, jurors who could truly consider each of the options and not automatically or even semi automatically go for one instead of the other. Now, could you fairly consider the evidence and make a real choice between the options?

Juror Falany: I think I could.

The Court: Well, what is the degree of your certainty about that?

Juror Falany: At our school I started a criminal justice program when I was dean, and I taught in that program, and I became convinced during those years when I was doing that that the country was going the wrong way when we talk about victims and the rights of persons who had committed crimes, and I haven't seen anything in what has happened in this country to convince me that we have changed our mind in that area. It seems like, as the law enforcement community convinced me at that time, the one reason why we have so much crime is because the jurisprudence system does not punish the people who commit crimes, and when I say I think I could be objective, I think I would try very hard to weigh the evidence and certainly be fair to the persons involved, but I couldn't say I didn't have a bias in that area simply because of that experience.

The Court: Well, is it fair to say, and again, we are leapfrogging over the guilt/innocence phase. That has got to come first, and you said you could be fair as far as deciding whether the Defendant is guilty or not guilty, but we are assuming now that we are getting to the penalty phase, and is it fair to say that the option of life imprisonment is an option that is open in your mind at this time?

Juror Falany: Yes, I think so.

The Court: Okay. You are excused for lunch until 2:15. Be in the jury assembly room at that time.

(Tr. Vol. 3, at 501–03).

### Juror Fields

The Court: I just wanted to ask you a few more questions about the matter of the death penalty.

Juror Fields: Uh-huh.

The Court: You indicated in your answers that you are very much in favor of the death penalty.

Juror Fields: Yes, ma'am.

The Court: Okay. We are looking for jurors in this case who can keep an open mind about what penalty, if any, should be imposed in this case. Of course, the jury will first have to decide whether the Defendant is guilty or not guilty. If he's not guilty, that will be the end of it, but if he's guilty, then we will go on to the penalty phase, and if we get to that phase, we are looking for jurors who can be fair in determining what penalty should be imposed in this case.

If we get to that point, the government will present evidence of what it considers to be aggravating factors, and they will argue that the death penalty should be imposed. The defense on the other hand will be presenting evidence of mitigating factors, evidence that they contend means that it is more appropriate for another penalty to be imposed; for example, one possibility would be life imprisonment without parole. Okay?

Now, if you were picked for the jury, could you fairly evaluate the evidence presented by the parties?

Juror Fields: Yes, ma'am.

The Court: And is it fair to say that options other than the death penalty are open options in your mind?

Juror Fields: Oh, yes. I didn't mean to be like just positive, yes, death penalty, but yes, I'm fairly open-minded, I believe.

(Tr. Vol. 3, at 511–12).

### Juror Rudasil

The Court: You indicated in your questionnaire that you were very strongly in favor of the death penalty. Of course, the jury in our case is first going to have to decide if the Defendant is guilty or not guilty. If he is not guilty, then there will be no occasion for the jury to consider what penalty would be appropriate, but if he is found guilty, then the jury is going to have to decide on the penalty, and we are

looking for jurors who can give fair consideration to all of the possible options, one being the death penalty, but there would be other options as well including, for example, the option of life imprisonment without parole.

If you were on the jury, do you think you could give fair and impartial consideration to all of the options?

Juror Rudasil: Yes, I do, because I am a very logical person, and I have to hear things, and I don't go on emotions. I'm not an emotional person.

The Court: Okay. You are free to go on home for the rest of the day.

(Tr. Vol. 3, at 522).

### Juror Cody

The Court: You indicated in your questionnaire that you are very strongly in favor of the death penalty.

Juror Cody: Correct.

The Court: Now, of course, the jurors that we pick are first going to decide whether the Defendant is guilty or not guilty, and if the Defendant is found not guilty, then we will never get to the penalty phase of the trial, but if he is found guilty, the jury is going to have to decide on the penalty, and we are looking for jurors who can give fair consideration to all of the available options. One of the available options, of course, is the death penalty, but one of the other available options, for example, is life in prison without parole.

If we get to that part of the trial, the government is going to be presenting evidence that it considers to be an indication that the death penalty is the right choice. Evidence of aggravating circumstances is what the government would be presenting. On the other hand, the Defendant at that stage would be presenting evidence of mitigating circumstances, evidence which the defense feels would tend to indicate that life in prison, for example, would be a more appropriate penalty.

I anticipate that the evidence presented at all stages of the trial including that phase is going to be conflicting evidence. The jury is really going to have to decide what the facts are.

If you were on our jury, and if we get to that penalty phase of the trial, could you give fair consideration to all of the available options?

Juror Cody: Yes, I could.

The Court: Is it fair to say that you are not at this point already predisposed toward one of the options?

Juror Cody: I am not predisposed.

The Court: Okay. I'm going to go ahead and let you go home for today. Please be in the jury assembly room at 9:30 tomorrow morning. Remember not to discuss the case with anybody overnight, and avoid any media reports. Thank you.

(Tr. Vol. 3, at 525–26).

### Juror Cobb

The Court: If we do get to the death penalty phase of the trial; in other words, if the jury finds that the Defendant is guilty of committing premeditated murder, then the jury is going to have to decide what the penalty is going to be in this case, and there are a number of penalties that are potentially applicable, one being the death penalty, another possibility being life in prison without parole, as well as others, and we are looking for jurors who can give fair consideration to each option.

Juror Cobb: I can.

The Court: Now, I think what is going to happen at the death penalty phase, if we get to that point, is the government is going to present evidence of aggravating circumstances. The defense is going to present evidence of mitigating circumstances, and the jury is going to be asked to weigh all of that evidence and decide what penalty is appropriate consistent with the court's instructions on the law.

Now, given the fact that you indicate that you are strongly in favor of the death penalty, how sure are you that one of the options other than the death penalty would be a realistic option for you?

Juror Cobb: I am in favor of the death penalty because I think the court should have that option, and there again it depends on the evidence that is presented during the case, and how it is deliberated

in the jury room, and it would depend on a great deal of what evidence I hear.

The Court: Well, I guess another way to ask my question is can you conceive of a murder case, a case where the defendant has been convicted of murder, but where there might be a good reason not to impose the death penalty?

Juror Cobb: Yes, ma'am.

The Court: Okay. You are excused for the balance of this afternoon. Please be in the jury assembly room at 9:30 tomorrow morning. Avoid any media reports, and don't discuss the case with anyone.

(Tr. Vol. 3, at 541–42).

### *Juror Jackson*

The Court: Mr. Jackson, thank you for your patience. We appreciate it. You indicated in your answers to the questionnaire that you strongly favor the death penalty, and I wanted to just follow up on that with a few more questions.

As you know, the charge in this case is murder, and, therefore, the first thing the jury is going to have to do is decide whether the Defendant is guilty or not guilty of murder. In order to find the Defendant guilty of murder, the jury is necessarily going to have to find that the Defendant acted intentionally, that it was a premeditated act, that he knew what he was doing, [and] he knew what he was doing was wrong. If the jury finds that, then we will go on to the penalty phase of the trial.

At that phase of the trial both sides will be presenting some more evidence. The government would be presenting evidence of what is called aggravating circumstances, reasons why they think the death penalty is the right penalty. The defense, on the other hand, will be presenting evidence in mitigation, evidence that tends to indicate that some penalty other than the death penalty should be imposed; for example, a possibility would be life in prison without parole.

Now, my question to you is given the fact that you strongly favor the death penalty, could you give fair and serious consideration to the possibility of some penalty other than the death penalty if we get to that point?

Juror Jackson: I could when you get to all the points in it, what you are talking about, what you are trying to cover over the person.

The Court: I'm not sure I understand what you are saying. Could you just repeat that?

Juror Jackson: Well, I guess they are going to have the lawyers speak about this and about that, and from that is what I'm saying.

The Court: And also before the lawyers make their arguments about what the penalty should be, the jury will be hearing evidence.

Juror Jackson: That's what I mean.

The Court: And what I'm asking you is at this point do you think you have got an open mind? In other words, could you give serious consideration to the arguments made by both sides?

Juror Jackson: Right.

The Court: Do you think you could?

Juror Jackson: I could, yes.

The Court: I mean we are looking for people—we can't have anybody on the jury that just, you know, says one penalty or the other is just out.

Juror Jackson: Right.

The Court: Okay. And we have to have people who can fairly and conscientiously look at all the available options in the penalty category, and make a fair choice among those penalties. Can you do that?

Juror Jackson: Right, I believe I can do it.

The Court: And are you telling me that you are not already kind of pointed toward the death penalty?

Juror Jackson: Right, right.

The Court: Okay. Mr. Jackson, you are free to go on home for today. Please be in the jury assembly room at 9:30 tomorrow morning. Remember not to discuss the case with anybody, and avoid any media coverage on the case.

(Tr. Vol. 3, at 586–88).

### *Juror Gravett*

The Court: You indicated that you were somewhat strongly in favor of the death penalty.

Juror Gravett: Yes.

The Court: And that you would definitely not want for it to be abolished.

Juror Gravett: Right.

The Court: Okay. My question is if you were picked for the jury in this case, and we got to the point where the jury had to decide the penalty; in other words, if the Defendant was convicted of first degree murder, and then we got to the penalty part of the case, both sides would be presenting more evidence. The government would be presenting evidence of claimed aggravating circumstances. The defense would be presenting evidence of alleged mitigation, things that would suggest the death penalty shouldn't be imposed.

Could you fairly and impartially evaluate that evidence, and make a fair decision as to what penalty option should be chosen in this case?

Juror Gravett: I think I could.

The Court: Well, is it fair to say that if the Defendant was first convicted of first degree murder, that you could still keep an open mind and consider the possibility at the penalty phase of another sentence; for example, life without parole? Would you be able to fairly consider that as an option?

Juror Gravett: Yes, uh-huh.

The Court: You don't consider that you are already kind of pointed in the direction of the death penalty since you favor the death penalty?

Juror Gravett: Not really, huh-uh.

The Court: Do you think you could make a decision in this case based only on the evidence that you hear in court?

Juror Gravett: Yes.

(Tr. Vol 3, at 590–92).

■■■ The court rejects the argument that a juror who "strongly favors" the death penalty is *per se* disqualified from jury service where he states that he could make a fair, individualized decision based on the evidence, including aggravating or mitigating circumstances, in accordance with the court's instructions on the law. Such a juror, by definition, is not "substantially impaired" because "substantial impairment" does not re-fer to mere ideological commitment, but rather refers to the juror's inability to be a fair and impartial trier of fact, consistent with the law.

The court also rejects Defendant's argument that inadequate questioning occurred to allow counsel to identify disqualified jurors. The questionnaire, most specifically question No. 57, asked the very question required by *Morgan*. Because the jurors had been given a fair amount of information about the case, the court considers that the responses to question No. 57 were well-informed responses. In addition, all those jurors who had stated strong support for the death penalty were orally questioned by the court to probe their commitment to acting as a fair and impartial trier of fact at the sentencing hearing, as envisioned by *Witt*.[1] Thus, the voir dire was adequate. Because the court was convinced that the jurors identified by Defendant had shown an ability to be fair and impartial, they were properly retained in the pool of prospective jurors.

■■■ The Defendant next objects to the insufficiency of the voir dire as to juror Duffy, and the court's denial of Defendant's motion to challenge Duffy for cause. Juror Duffy, like the group previously described, had indicated on his questionnaire that if the Defendant were convicted of murder without legal justification, in determining whether or not the death penalty should be imposed, he would "make [his] decision based on consideration of the evidence in this particular case, including evidence of aggravating or mitigating circumstances, and in accordance with the court's instructions on the law". Also, Duffy had indicated that he favored the death penalty "very strongly". Duffy was questioned by government counsel; the court did not allow a question attempted by defense counsel and the court concluded the voir dire questioning of Duffy.

During voir dire questioning by the government, the following questions (among others) were asked:

Q. Assuming that we get to the penalty phase, of course, there is going to be the

---

1. Other jurors were orally questioned regarding death penalty views as well. For example, juror Patty had given apparently inconsistent answers to death penalty questions on the questionnaire. *See* TR Vol. 3, pp. 443–451. Another juror had limited education. *See* TR Vol. 3, pp. 590–592.

guilt phase first where the prosecution, which I represent, will be charged with proving the defendant guilty, but for the purposes of this hypothetical question, assume that the jury has found the defendant guilty, and I'm not asking you to make any assumptions about the evidence, just make that assumption for the purpose of the question. You are likely to hear testimony or evidence presented by the prosecution about the defendant, and about things the defendant has done because the prosecution will submit to you that the evidence that you will hear from us is favorable to cause the jury to impose the death penalty, but on the other hand, you are going to hear evidence presented by the defendant both in the penalty phase and perhaps in the guilt phase that the defendant will be arguing should mitigate the punishment and should cause the jury to impose a punishment that would be something other than death, and [the court] is going to instruct you that you are going to have to consider all of this evidence in deciding what the appropriate punishment should be.

If you find the defendant guilty of premeditated first degree murder, do you think you can consider all the evidence both for the prosecution and from the defense in deciding what an appropriate penalty should be in this case?

A. I think so. I wouldn't have any problem with that.

Q. And even if that evidence that is presented by the defendant is evidence of a reduced mental state or ability, even if it doesn't rise to the level of insanity, would you be able to consider that in mitigation of punishment if [the court] instructs you that you are required to do that under your oath as a juror?

A. Yes.

(Tr. Vol. 3, at 563–64).

At the conclusion of government counsel's examination of juror Duffy, the following occurred:

By Mr. Martin:

Q. Mr. Duffy, your opinion about the death penalty, if you find somebody guilty beyond a reasonable doubt of premeditated murder without legal justification such as self-defense, and they are saying they knew what they were doing, and they knew it was wrong, would it be your opinion that that person ought to get the death penalty?

Mr. McKinnon: Your Honor, I object to that question because that doesn't factor in everything Mr. Duffy is going to have to consider.

The Court: I think it is not a complete question either. What we are looking for, Mr. Duffy, is to make sure—of course, you don't even get to the death penalty phase unless the jury has first found that there was a premeditated intentional murder. So, we are starting at that point, and what we want to know is whether going forward from that point, a sentence other than death; for example, life imprisonment, would that be a live option for you, something that you could really carefully consider?

Jury Duffy: Yes, I think so. I don't have any problem with that.

(Tr. Vol. 3, at 564–65).

The court finds that the questioning of Juror Duffy was adequate. The questions posed to Juror Duffy by the questionnaire, the government, and the court clearly probed the issue of whether he would automatically impose the death penalty as required by *Morgan*. Juror Duffy stated that he would be able to consider other options to death, and he also stated that he could follow the statutory scheme and consider aggravating and mitigating circumstances. The questions asked of Juror Duffy were much more specific than the general fairness questions found inadequate in *Morgan*, and his answers to those questions allowed the court reasonably to conclude that he would not be substantially impaired from serving as a juror.

Defendant appears to argue that the court's refusal to allow questioning of Juror Duffy by the defense was a *per se* violation of Defendant's rights. In *Morgan*, the Court noted that "voir dire is conducted under the supervision of the court, and a great deal, must, of necessity, be left to its sound discretion"; furthermore, "the Constitution does not dictate a catechism for voir dire...." *Morgan*, 504 U.S. at 729, 112 S.Ct. at 2229. The court first notes that Defendant did have

some input into the questioning of Duffy due to the fact that counsel participated in the drafting of the juror questionnaire. Furthermore, the government's questioning of Juror Duffy was open-ended and balanced. It actually included a question on whether Juror Duffy would be able to give consideration to a mitigating factor likely to be presented by Defendant. Defense counsel's question was not adequately tailored to the facts of this case and was properly disallowed. Also, the question required by *Morgan* had been answered when juror Duffy answered question No. 57. Overall, there was adequate questioning of juror Duffy.

■ Defendant's remaining argument as to the voir dire and excusal of specific jurors pertains to prospective jurors Blackwell and Frederick, each of whom indicated that he was "somewhat strongly" in favor of the death penalty, but that if the Defendant were convicted, he could make a sentencing decision "based on consideration of the evidence in this particular case, including evidence of aggravating or mitigating circumstances, and in accordance with the court's instructions on the law".

The defense requested that the court question these jurors with respect to death penalty views. The court declined, pointing out that both had indicated they could make a fair and individualized determination as to the sentence and further, both had stated that they were "somewhat strongly" in favor of the death penalty, not "very strongly". The defense's motion to challenge juror Frederick for cause was denied. (Tr. Vol. 3, at 463). Frederick did not serve on the jury. (Tr. Vol. 4, at 647, 700–01). The defense did not move to challenge juror Blackwell for cause; Blackwell was not selected for the jury. (*Id.*)

While no oral questioning was conducted with respect to whether Juror Frederick and Blackwell's views on the death penalty would prevent them from being impartial, their answers on the questionnaire adequately probed the issue.[2] The court had an opportunity to observe these jurors and listen to their responses and other questions, and felt

that it was appropriate for their questionnaire responses to be taken at face value. Because both jurors indicated an ability to consider the penalty options fairly and appropriately, neither was "substantially impaired" under *Witt*. Therefore, the voir dire was sufficient and Defendant's motion to excuse Frederick for cause was properly denied.

■ Defendant next argues that a new trial should be granted on the issue of guilt because the court erroneously sustained the government's objection to the defense's calling Richard Rogers, Ph.D., a clinical psychologist, to testify as a rebuttal witness during the guilt-innocence trial. The court found that Rogers was not a rebuttal witness, and that it would be prejudicial to allow the Defendant's case to be reopened at the end of the trial.

The order of proof during the guilt/innocence trial was as follows: government's case in chief (not including any psychiatric evidence); Defendant's case in chief (including both evidence contesting guilt and psychiatric/insanity evidence); government's response to psychiatric/insanity evidence; and Defendant's rebuttal. It was during the last phase that Defendant wished to call Dr. Rogers.

Defense counsel stated that Rogers had not been called during the Defendant's case in chief because the idea of calling Rogers occurred late. (Tr. Vol. 15, at 3160). Counsel proffered that Rogers, if called, would testify that he had reviewed the written results of a structured interview administered to the Defendant by Mark Hazelrigg, Ph.D., a clinical psychologist employed by the government. This interview occurred as part of a court-ordered evaluation at FCI–Butner in 1996. Counsel stated Rogers would testify that he is the primary author of The Structured Interview of Reported Systems ("SIRS"); that the SIRS results showed that Defendant was not malingering his symptoms and that Hazelrigg had mis-scored the test, such that whereas Hazelrigg had testified that the SIRS showed a 72.8% probability of honest responding, an accurate scoring

---

2. The court did conduct individual voir dire with both jurors in other subject areas, however. *See*

Tr. Vol. 3, pp. 462–63, 484–85.

of the test would show that there was a 95% probability of honest responding.

During his opening statement in the guilt/innocence trial, government counsel stated that the government would be arguing that the Defendant had never made claims of being monitored by implants or hearing voices until his interview with a defense psychiatrist in May 1995. (Tr. Vol. 4, at 737–38). In his opening statement, defense counsel stated that "One of the things you will have to decide in this case is malingering." Tr. Vol. 4, p. 380. In listing various test procedures which contra-indicated malingering, defense counsel said:

> Finally the structural interview. This is the one test all the psychologists and psychiatrists will tell you is designed to determine one thing, test one thing, is he telling the truth? Listen carefully. It is a test designed by a psychologist named Richard Rogers, who is known to be an expert in the area. Listen to that testimony. 72 percent positive. TR. Vol. 4, p. 785.

During the Defendant's case in chief, mental health experts testified that they had relied on many test instruments, including the SIRS interview conducted by Dr. Hazelrigg at Butner in January 1996, in reaching their conclusions that the Defendant was suffering from paranoid schizophrenia on the date the offense was committed and that he was not feigning delusions or auditory hallucinations. Stephen O'Hagan, Ph.D., a clinical psychologist, and George Woods, M.D., a psychiatrist, so testified (Tr. Vol. 9, at 1847–52; Tr. Vol. 10, at 2109–10). O'Hagan described the SIRS, pointing out that Defendant's results showed a high probability (72.2%) that he had honestly responded to the test. Defendant's Exhibit 41, the manual which describes the SIRS [3] and gives instructions for administering the test, was admitted during O'Hagan's testimony, as was Defendant's Exhibits 42, the sheet reflecting Defendant's responses and scoring on the SIRS.

During the government's presentation of psychiatric/ insanity evidence in response to Defendant's evidence, the government called as one of its witnesses Mark Hazelrigg, Ph. D., a clinical psychologist who testified that he had administered the SIRS to the Defendant as a part of a battery of tests on January 31, 1996. He testified that Mr. Battle "scored in what would be called the honest range on five of the eight primary scales, and in the indeterminate range on three of the scales." (Tr. Vol. 13, at 2691). He stated that the SIRS "did not clearly show that the Defendant was malingering." (Tr. Vol. 13, at 2695). On cross, Hazelrigg testified that the probability of the Defendant's feigning on the test was 27.8% (Tr. Vol. 13, at 2725), and that the 27.8% represented "some probability" that the Defendant was malingering. (Tr. Vol. 13, at 2726). He then clarified that he meant that there was "some possibility" that the Defendant was not telling the truth on the test, and that "there is a possibility, a 27.8% chance that he was faking this test." (Tr. Vol.13, 2726–2727). The defense asked no questions of Dr. Hazelrigg concerning his scoring of the SIRS.

Rogers was called as a defense witness during the sentencing phase of the trial. At that time, he testified that the SIRS is designed to identify mental health patients who are malingerers—those who deliberately fabricate or grossly exaggerate their symptoms. He clarified that the SIRS is not a test designed to determine whether an individual is making up specific symptoms. Rather, the test compares the response profile of the test-taker to the response profiles of subjects who were used to develop the test. He testified that the individuals used to develop the test included 36 mental health patients identified by clinicians as probable malingerers, plus 130 simulators who were hired to fake mental illness in the interview. In developing the test, control groups were used comprised of both patients and others who had been identified as honest responders. Profiles were developed identifying a probable response pattern for those in the following ranges: honest responding; indeterminate range; probability of feigning; and definite feigning. Rogers ultimately testified that Hazelrigg probably had scored the Defendant's interview correctly.

The court believes it correctly concluded that Rogers' proffered testimony was not rebuttal. Rather, the purpose of calling

---

**3.** Dr. Rogers is the primary author of the manual.

Rogers at that particular time was to reemphasize what the government had not contested—Defendant had scored well on the SIRS, an interview procedure designed to detect a malingering response profile. The court felt that it would be unfairly prejudicial to allow the Defendant to call Dr. Rogers at the very end of the guilt/innocence trial. Further, even if Rogers had been called, it would not have been helpful to the Defendant. Rogers' testimony, which was ultimately given at the sentencing phase, served to clarify that Hazelrigg had properly scored the test, and moreover, that the test was not designed to measure whether particular symptoms were being falsely reported. Accordingly, the court finds it did not abuse its discretion in refusing to allow Rogers to be called, either as a rebuttal witness or upon the reopening of the Defendant's case in chief. *See United States v. Willis*, 759 F.2d 1486, 1502 (11th Cir.1985) (noting that the court has substantial discretion in deciding whether to allow rebuttal testimony or the reopening of defendant's case in chief).

■■■ Defendant next argues he is entitled to a new sentencing hearing based on his claim that Gregory Hershberger, a witness called by the defense, allegedly gave false and misleading testimony unfavorable to the defense. Hershberger is the Warden of the United States Penitentiary Administrative Maximum in Florence, Colorado (ADX). He was called by the defense during the sentencing hearing to establish the very high level of security available at ADX, particularly in the control unit (maximum security unit), which houses very violent prisoners. The defense's purpose in calling him was to establish that the federal prison system has a form of incarceration available which would be an effective deterrent in Battle's case, in lieu of the death penalty.

Defendant does not complain of the testimony given by Hershberger concerning the high level of security available at ADX. Defendant does complain, however, of testimony given by Hershberger during the government's examination of him. This examination by the government was calculated to show that, while ADX does have an especially high security control unit, inmates are not necessarily retained there indefinitely. Hershberger testified that the period of seg-

regation in the control unit is determined by the warden; he believed the initial placement for inmates who had killed other inmates had been running approximately 72 months. (Tr. Vol. 20, at 4229, 4230). Near the end of the time originally assigned for control unit placement, the inmate's experience is reviewed and a determination is made as to whether to release him to general population or to another high security institution. Retention in the control unit is an option. Hershberger testified that ADX currently houses six inmates that have murdered staff, and four of those were Bureau of Prisons staff. (Tr. Vol. 20, at 4239). He testified that the murders in question had occurred prior to the enactment of the federal death penalty and that the inmates are in the general population at ADX (i.e. not in the control unit).

Defendant states that he has now determined that the inmates at ADX in general population did not commit first degree murder, but rather were convicted of lesser charges (second degree murder, manslaughter) during the early to mid–1980's. Also, only three (not four) inmates had killed Bureau of Prisons staff. He argues that Hershberger's testimony improperly implied that the inmates had committed murders similar in gravity to that committed by the Defendant. Defendant appears to argue that a death sentence based even in part on Hershberger's testimony would violate his due process rights. *See Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); and *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

The court will assume that Defendant correctly states the facts regarding the convictions of the inmates who murdered guards, and will further assume for purposes of this order that the "new evidence" would be fully admissible at this point. Nonetheless, the Defendant's argument fails. Based on a review of the transcript, it is not a proper inference that Warden Hershberger knowingly gave misleading testimony or that the testimony created a substantial likelihood of misleading the jury. The point of the gov-

ernment's line of questioning was obviously to show that control unit placement is not indefinite and even an inmate who has killed a guard may wind up in general population. Defendant does not challenge the factual accuracy of this statement. Since Hershberger's testimony was neither materially false nor intentionally misleading, nor does there appear to be a risk that the jury was misled, a new sentencing hearing should not be granted based on this ground.

■ Defendant next argues that a new sentencing hearing is required because the court erroneously allowed testimony from three Bureau of Prisons guards, Anthony Layfield, Henry Schealey, and Juel Hawkins, as to how the inmates at USP–Atlanta reacted to Officer Washington's death and whether the imposition of the death penalty would deter other inmates from attacking prison guards. Their testimony in relevant part was as follows:

Q. If the sentence that the jury renders is a life without parole sentence, how do you think that would affect the inmates in the institution?

A. The inmates already have an attitude. Once they receive a lengthy sentence or life imprisonment, that's all that can happen to them. So, I believe the situation would worsen. Without the death penalty, all prisoners, they believe there is nothing else that can happen to them. . . .

Q. Did you see a change among the inmates after [Officer Washington] was killed?

A. Of course, yes, ma'am.

Q. What kind of change?

A. When you went to enforce policy, they would be walking around saying things like, "Hammer time," or "Don't forget I got 20 years. I'll be here every day with you." Basically it was threats toward staff members.

(Testimony of Anthony Layfield, Tr. Vol. 17, at 3492–93).

Similarly, Henry Schealey testified as follows:

Q. Officer Schealey, I had just asked you the question did you see an effect on the inmates at USP Atlanta following Tony's death?

A. Yes.

Q. And what kind of effect was that?

A. Everybody is walking around smiling now, and if an officer tells an inmate to do something, he would said (sic), "He need (sic) to leave me alone, or I'll get a hammer after you." You see people walking around saying, "Hammer time, hammer time."

Q. Do you think the murder of Officer Washington would have improved inmate Battle's status within the prison among inmates?

A. Yes.

Q. Did you see evidence of that?

A. Yes. Everybody been talking about the incident ever since it happened. So, they talk about the inmate also.

Q. And they would refer to Mr. Battle himself?

A. Yes.

Q. How would the imposition of the death penalty in this case affect the correctional officers?

Mr. Martin: Your Honor, can I have a continuing objection to any opinions in this regard?

The Court: Yes.

By Ms. Jenkins:

Q. You can answer.

A. Will you reask the question?

Q. How would the effect of the death penalty being rendered as a verdict in this case or as a sentence in this case affect the correctional officers at USP Atlanta and BOP?

A. Well, it would just let us know if the inmate want (sic) to assault a staff member or kill a staff member, he know he going (sic) to get a death penalty trial.

Q. How do you think it would affect the inmates?

A. It would have them thinking twice before they assault an officer or staff member.

Q. And in the event that a life sentence were imposed, how do you think that would affect correctional officers?

A. It would have a hard setting on the staff members because we know an inmate doing 99 years, and he know if he kill an

officer, what is he going to get? Another 99 years, but what is that to him? And it have an impact on the officers. We got to realize we got to work in this kind of environment, and if an inmate is going to assault us, he's not going to get but just another 99 years plus the 99 he already have.

(Testimony of Henry Schealey, Tr. Vol. 17, at 3482–83).

Finally, Juel Hawkins testified as follows:

Q. What kind of reaction did you get from them in regard to Tony's murder?

A. At that particular time I believe I was working in the special housing unit, which is where inmates are housed that have committed infractions against the Bureau of Prisons, and some inmates would like taunt us about him being killed. If they didn't like something we were telling them to do, they would say something like better watch it. I'm going to go get that hammer. They were very cruel, ugly things about his death that they would throw back in our face.

Q. If the jury were to impose the death penalty in this case, do you have an opinion about what impact that would have on, I guess, the operation of the USP Atlanta in terms of the staff and the security issues that you have there?

A. I believe that this would send a very clear signal to the inmates and staff members as well that you cannot commit this type of infraction. You cannot kill a staff member and just absolutely nothing be done about it.

Q. Do you have an opinion about what impact the imposition of a life sentence would have on, let's say, the issue of security, and the relationship to the staff, and dealing with the inmates at the institution?

A. If a person is already serving a life sentence, what is giving them another life sentence going to do? You can kill a staff member, and nothing is going to happen except you are going to remain in jail. You are going to do that anyway. Most of the inmates we have house there are never getting out of there. So, they, figure, well, if I kill a staff member and all I have to do is stay in jail, what's to prevent me from doing it again? Nothing.

(Testimony of Juel Hawkins, Tr. Vol. 17, at 3512–14).

Defendant's first objection is that admission of this testimony violated the Eighth Amendment because it did not lead to an "individualized determination" as to whether the death penalty was appropriate in this case. *See Booth v. Maryland,* 482 U.S. 496, 502, 107 S.Ct. 2529, 2532–33, 96 L.Ed.2d 440 (1987), *overruled in part, Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In *Booth,* the Supreme Court held that the trial court improperly allowed before the jury evidence of the victim's family members' opinions and characterizations of the crime. The family members stated in a report that was presented to the jury their belief that "[nobody] should be able to do something like that and get away with it," and, the victims' daughter stated that "she doesn't want [the defendants] to be able to do this again or put another family through this." *Booth,* 482 U.S. at 508, 107 S.Ct. at 2535. In finding that this evidence was improperly before the jury, the Court noted,

> The formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. As we have noted, any decision to impose the death sentence must 'be and appear to be based on reason rather than caprice or emotion.' ... The admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decision-making we require in capital cases.

*Id.,* at 508–09, 107 S.Ct. at 2535–36 (citation omitted).

The court finds that the admission of the prison guards' testimony does not run afoul of the Eighth Amendment and the Supreme Court's holding in *Booth.* In *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983), the Court noted that what the constitution requires during sentencing in a capital trial "is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Stephens,* 462

U.S. at 879, 103 S.Ct. at 2744. As noted above, in *Booth,* the Supreme Court held that this individual determination mandated exclusion of emotionally charged statements by the crime victim's family because such statements could cause a jury to return a verdict based on caprice or emotion rather than on consideration of the defendant's character and the circumstances of the crime.

The statements made by the officers in this case differ significantly from those excluded in *Booth* because they are not general emotional pleas favoring the death penalty. On the contrary, rather than taking the jurors' focus off of the facts of this case, the testimony of the officers served to place Defendant's actions in context. In this case, Defendant killed Officer Washington while incarcerated at USP–Atlanta. The impact of Defendant's actions could not fully be appreciated without discussing how his actions affected the prison society within which the killing occurred.

■ In addition, the testimony was relevant to two statutory aggravating factors: (1) that Defendant was serving a life sentence and (2) that he killed a prison guard. Deterrence of murder of guards by inmates already serving a life sentence clearly underlies these two aggravating factors.

Defendant argues that to the extent the evidence was offered to support the proposition that imposing the death penalty in this case would serve as a deterrent, it is barred by case law. Specifically, Defendant points to *Martin v. Wainwright,* 770 F.2d 918 (11th Cir.1985), as binding authority for the proposition that while argument as to deterrence is allowed at a capital sentencing hearing, neither side is permitted to present evidence as to any deterrent effect the sentence may have. In *Martin,* the court was faced with a situation where a capital defendant wanted to call a law professor to testify that the death penalty has no general deterrent effect and that, in particular, the death penalty does not deter the mentally ill. The professor was allowed to testify as to the lack of general deterrence, but was not allowed to speak as to specific non-deterrence of the mentally ill. The court also gave an instruction to the jury that attempted to limit the jury's consideration of the deterrence effect of a death verdict.

The court in *Martin* held that the court did not err in limiting the presentation of evidence relating to deterrence. The court held that the evidence that the defendant sought to present was designed "to persuade the sentencer that the legislature erred, in whole or in part, when it enacted the death penalty statute." *Martin,* 770 F.2d at 936. The defendant's deterrence evidence, therefore, was not "constitutionally indispensable" since it was not designed to help the jury make an individualized decision in the defendant's case but rather attempted to put the entire death penalty system on trial. *Id.* Based on this conclusion, the court indicated that, while counsel are allowed to argue deterrence during a capital sentencing trial, the Eighth Amendment is not violated if a state excludes evidence relating to deterrence. *Id.,* at 937.

■ Defendant would have the court read *Martin* as standing for the proposition that the Eighth Amendment is violated if a court allows the presentation of evidence relating to deterrence at sentencing. The specific holding in Martin, however, was that the trial court did not violate the Eighth Amendment when it excluded evidence relating to deterrence. Nowhere in the majority's opinion in *Martin* did the court announce a blanket prohibition on evidence related to deterrence. Such evidence is admissible as long as it meets the Eighth Amendment's requirement that it is relevant to an individualized determination as to whether capital punishment is appropriate in a given case. The testimony of the three officers in this case meets this standard.

■ Defendant's final argument with respect to this testimony is that it should not have been allowed because Defendant did not receive proper notice that the government was going to elicit such testimony from the guards. This argument was addressed during court proceedings on March 14, 1997. (Tr. Vol. 18, at 3630–32). At that time the court rejected this argument on the basis that proper notice was given because the testimony was related to two of the aggravating factors set out in the government's original notice of intention to seek the death penalty: the factor that Defendant had com-

mitted the instant offense after having previously been convicted of another offense for which a sentence of life imprisonment or death was authorized by statute; and the factor that the victim of Defendant's crime was a correctional officer. *See* 18 U.S.C. §§ 3592(c)(3) & (c)(14)(D). The testimony of the guards served to point out what is obviously the policy reason underlying these two aggravating factors: to protect prison guards and other prison employees (most of whom are unarmed) from attacks by inmates, especially those already serving a life sentence and for whom another life sentence offers no real deterrence. Therefore, the guards' testimony was not surprising or prejudicial.

Defendant's next claim is that he is entitled to a new trial because the court erred in excluding evidence which Defendant argues would have entitled him to a voluntary manslaughter charge. The court previously addressed this issue in open court on February 26, 1997. (Tr. Vol. 7, at 1523–30). At that time, Defendant's counsel noted that, despite Defendant's own testimony to the contrary, other evidence obtained by counsel suggested that Defendant may have been provoked to attack Officer Washington by another inmate, Richard Boone. (Tr. Vol. 7, at 1523–24). Defendant testified that on the day he killed Officer Washington, he asked Boone to borrow a hammer that Boone was using. (Tr. Vol. 7, at 1501–02). Defendant stated that Boone did not say anything of note to him when Boone gave him the hammer, and Defendant testified that Boone was not in any way involved in the murder of Officer Washington. (Tr. Vol. 7, at 1502). After reviewing the evidence that Defendant sought to introduce, the court found much of it to be inadmissible hearsay. (Tr. Vol. 7, at 1528). Furthermore, the court noted that while Defendant's evidence attempted to point out a drug conspiracy between Boone and Officer Washington, the evidence wholly failed to demonstrate that Boone had said anything to incite Battle to kill Washington. (Tr. Vol. 7, at 1529). Given this fact, and the fact that Defendant's testimony indicated that he was not provoked to kill Officer Washington by another inmate, the proffered evidence was excluded. The court notes that evidence of Officer Washington's alleged involvement in a drug conspiracy, and evidence seeking to suggest that Washington had "ripped off" his alleged co-conspirators, including inmate Boone, was introduced by Defendant during the sentencing phase, notwithstanding the hearsay nature of the evidence.

■ The next argument set forth by Defendant is that pursuant to *Shannon v. U.S.*, 512 U.S. 573, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994), the court should have instructed the jury on the consequences of a not guilty by reason of insanity (NGRI) verdict. In *Shannon*, the Court held that neither the Insanity Defense Reform Act of 1984, 18 U.S.C. §§ 17, 4241–4247, nor general federal practice requires a district court to instruct the jury as to the consequences of an NGRI verdict. The court stated, "It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Id.*, at 579, 114 S.Ct. at 2424. As the jury in this case prior to finding Defendant guilty did not have a sentencing function, it would appear that the general rule announced in *Shannon* should apply. Defendant claims that an exception should be made to this general rule because of references during the guilt-innocence phase of the trial as to Defendant's dangerousness.

In *Shannon* the Supreme Court did hold that where a jury appears to be operating under a misconception as to the consequences of an NGRI verdict, the court should step in to correct such a misconception. *Id.*, at 587–88, 114 S.Ct. at 2428–29. However, there is no reason to believe that the jury was misinformed as to the consequences of an NGRI verdict in this case. The jurors knew that the result of an NGRI verdict would not allow the Defendant to be released; he is already serving a life sentence. This fact was underlined in the prosecutor's closing argument. A jury instruction as to the consequences of an NGRI verdict was not necessary or appropriate.

■ The next ground relied upon by Defendant in his motion for a new sentencing hearing is that the court erroneously allowed the government to amend its notice of intention to seek the death penalty after the trial

had begun. The amendment to the notice did not add a new aggravating factor, but rather listed additional evidence that the government wanted to present at the sentencing hearing pertaining to Defendant's assaultive behavior toward prison guards and his future dangerousness. This issue was addressed during a pretrial conference on March 13, 1997. (Tr. Vol. 17, at 3352–80). Under 18 U.S.C. § 3593, the government's death penalty notice may be amended upon a showing of good cause. In this case, the court found that good cause existed because some of the new evidence[4] did not exist until after the government's original notice was filed and because the government gave Defendant written notice thirty days before the guilt/innocence trial began that the evidence set out in the amendment to the notice would be used at the sentencing hearing.[5] The court found that, given this advance notice, Defendant would not suffer any prejudice if the court allowed the government's official notice to be formally amended. The court sees no reason to depart from its earlier ruling on this issue, and therefore Defendant is not entitled to a new sentencing hearing based on the government's amendment to its notice of intention to seek the death penalty.

■ Defendant next argues that a statement made during the government's closing argument at sentencing mandates a new sentencing hearing. Specifically, Defendant complains of the following statement from the government's closing argument:

> He is already serving a life sentence. These are natural life sentences, he can only serve one. Adding a second one even consecutive to the first won't mean anything. He's not likely to be released from prison. He wouldn't likely have been released from prison even had you found him not guilty. So, adding a second life sentence even without the possibility of parole is not going to punish him.

(Tr. Vol. 21, at 4561). Defendant claims that this statement misled the jury into thinking that the imposition of a life without parole sentence in this case would impose no additional punishment on him even though Defendant's first sentence contained the possibility of parole.

The court finds that the government's statement was not improper and did not prejudice Defendant. Government counsel did not state that Defendant was ineligible for parole, but rather that it was unlikely that he would be paroled. Defendant claims that this statement was prejudicial to him because there was no specific evidence that Defendant was unlikely to be paroled. The court finds that since the jury had already found that Defendant had killed a prison guard while serving time for committing a murder, a proper inference would be that Defendant would not likely be paroled. Accordingly, the court finds that the government's statement was not improper and was not prejudicial.

■ Defendant has also moved for a new sentencing hearing based on his argument that allowing the sentencing jury to determine whether the factors set out in 18 U.S.C. § 3591(a)(2)(A), (B) and (D) had been proven unconstitutionally skewed the sentencing determination in favor of death. Defendant argues that these factors were duplicative of findings the jury necessarily had already made in finding Defendant guilty. Even if Defendant were correct, however, the court instructed the jury that the section 3591 elements were not to be considered as aggravating factors; rather they were threshold factors to be used to determine if the death penalty was even an option in this case. (Tr. Vol. 22, at 4640–41). Allowing the jury at sentencing to determine whether the section 3591 factors had been proven did not unconstitutionally skew the weighing process in this case in favor of death.[6]

■ Defendant next claims that submitting to the jury both the factor under section

4. Defendant's assault on a Paulding County, Georgia correctional officer did not occur until December 30, 1996, which was well after the government's notice was filed.

5. Section 3593 does not appear to require that the notice recite evidence; however, the govern-

ment's notice did set out the incidents which would be addressed at the sentencing hearing.

6. A copy of the jury's Special Findings following the sentencing hearing is attached as Exhibit B.

3591(a)(2)(B) and the aggravating factor contained in 18 U.S.C. § 3592(c)(6) was erroneous because the factors are duplicative. Submitting duplicative aggravating factors to a jury in a capital case has been held unconstitutional because it tends to skew the weighing process in favor of death and therefore may result in the arbitrary imposition of the death penalty. *See United States v. McCullah,* 76 F.3d 1087, 1111 (10th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997). As previously stated, the jury was not allowed to treat § 3591 factors as aggravating factors; moreover, the factors identified by Defendant do not impermissibly overlap.

Section 3591(a)(2)(B) provides that any person who intentionally inflicts serious bodily injury that results in death is eligible for the death penalty. Section 3592(c)(6) lists as an aggravating factor, "The defendant committed the offense in a heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." The intention to cause serious bodily injury factor relates to the defendant's state of mind at the time he injured the victim, while the "torture or serious physical abuse" factor refers to the means by which the injury was inflicted. Given this reading of the statute, these factors do not impermissibly overlap and submission of both factors for the jury's consideration was not erroneous.

■■■ As an additional argument, Defendant maintains that he should be granted a new sentencing hearing because the court failed to present to the jury all of the mitigating circumstances supported by the evidence and proposed by the defense as required by 18 U.S.C. §§ 3592(a) and 3593(c), (d) and (e). More specifically, Defendant contends that the court erred in failing to present to the jury the mitigating factors described in 18 U.S.C. § 3592(a)(4), entitled "Equally culpable defendants", and 18 U.S.C. § 3592(a)(7), entitled "Victim's consent". The court disagrees. First, because Defendant was the only defendant in this case,

there was no reason to instruct the jury regarding 18 U.S.C. § 3592(a)(4), which requires the jury to consider as a mitigating factor that another defendant or defendants, equally culpable in the crime, would not be punished by death. Second, with respect to 18 U.S.C. § 3592(a)(7), there was simply no evidence that the victim in this case, Officer Washington, consented to the criminal conduct that resulted in his death. Consequently, based on the foregoing, the court rejects Defendant's arguments with respect to this issue.[7]

Defendant's next claim is for judgment of acquittal based upon his contention that no reasonable jury could have found him guilty beyond a reasonable doubt. However, the evidence presented at trial was more than sufficient to support the finding of the jury that the Government proved all of the elements of the crime charged beyond a reasonable doubt. As noted earlier, while testifying during the guilt/innocence trial, Defendant admitted that he attacked and killed Officer Washington, the victim in this case, and that he had done so intentionally. The evidence was uncontradicted that Defendant was serving a life sentence in a federal correctional institution at the time of Washington's murder. Thus, after hearing this testimony, the only remaining issue for the jury to resolve in the guilt/innocence phase was whether the Defendant was insane at the time he attacked and killed officer Washington.

■■■ Under 18 U.S.C. § 17, Defendant had the burden of proving by clear and convincing evidence that as a result of a severe mental disease or defect, he was unable to appreciate the nature and quality or the wrongfulness of his acts. Upon a consideration of all the evidence submitted by both sides on this issue, the court finds that the jury could have properly concluded that Defendant did not meet his burden of proving insanity.

■■■ Turning to Defendant's next contention, the court also rejects Defendant's argu-

---

7. Defendant also argues that the court erred by not including on the "Special Findings" form *various non-statutory mitigating factors* proposed by Defendant. However, the mitigating factors submitted to the jury covered all appropriate mitigating factors. Furthermore, mitigating fac-

tor number six allowed the jury to specify any mitigating circumstance not specifically set forth. Thus, not including each and every mitigating factor in the form proposed by Defendant was proper.

ment that no reasonable jury could have found that the aggravating factors found by the jury in this case outweighed the mitigating factors found by the jury. The jury unanimously found beyond a reasonable doubt that five aggravating factors existed in this case, including that the Defendant "is a danger to the lives and safety of other persons". One or more of the jurors also found that four mitigating factors existed in this case, including that "... the Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, even though not so impaired as to constitute a defense to the charge". The court finds that a rational jury could have found that the aggravating factors outweighed the mitigating factors, based on the evidence and consistent with the court's instructions on the law. Accordingly, this argument is rejected.

▮ Defendant next raises the claim that death by electrocution violates the Eighth Amendment's proscription against cruel and unusual punishment. In denying Defendant's identical pretrial motion the court, in its February 18, 1997 order, noted that the United States Court of Appeals for the Eleventh Circuit, as recently as two years ago, has held that death by electrocution is constitutional. *See e.g. Ingram v. Ault,* 50 F.3d 898, 900 (11th Cir.1995); *Sullivan v. Dugger,* 721 F.2d 719, 720. (11th Cir.1983). Given these decisions, the court once again denies Defendant's claim that death by electrocution violates the Eighth Amendment.

Finally, Defendant reasserts a pretrial argument as to death by electrocution by arguing that imposition of the death penalty in this manner is an improper delegation of legislative authority and also violates his Fifth Amendment rights to equal protection under the law. The court rejected these arguments in its February 19, 1997 order, and, in the absence of new argument, finds no reason to revisit these issues.

Accordingly, Defendant's motion for judgment of acquittal, new trial and sentencing hearing, and correction or reduction of sentence [# 266] is DENIED.

SO ORDERED.

## APPENDIX

### *EXHIBIT A*

### **INFORMATION FOR PROSPECTIVE JURORS**

WE ARE SELECTING A JURY TO TRY A CRIMINAL CASE. THE INDICTMENT CHARGES THAT THE DEFENDANT, WHILE SERVING A LIFE SENTENCE, MURDERED A PRISON GUARD IN VIOLATION OF 18 U.S.C. § 1118. THE DEFENDANT HAS PLED NOT GUILTY. AN INSANITY DEFENSE MAY BE PRESENTED, AND IF THE PENALTY PHASE OF THE CASE IS REACHED, EVIDENCE CONCERNING THE DEFENDANT'S MENTAL CONDITION WILL BE PRESENTED.

THE JURY WILL DETERMINE WHETHER THE DEFENDANT IS GUILTY OR NOT GUILTY. IF THE DEFENDANT IS FOUND GUILTY, THE JURY WILL THEN DETERMINE WHETHER OR NOT THE DEATH PENALTY SHOULD BE IMPOSED.

THE TRIAL WILL LAST ABOUT THREE WEEKS. JURY SEQUESTRATION IS NOT ANTICIPATED. COURT HOURS WILL BE FROM 9:30 AM to 5:00 PM. COURT WILL NOT BE IN SESSION ON WEEKENDS.

PLEASE FILL OUT THE FOLLOWING QUESTIONNAIRE CAREFULLY AND COMPLETELY, USING BLACK INK. YOUR RESPONSES WILL BE VIEWED BY THE COURT AND COUNSEL ONLY. WRITE ON THE FRONT OF EACH PAGE ONLY. SIGN THE COMPLETED QUESTIONNAIRE AND TURN IT IN TO ONE OF THE COURT CLERKS.

## QUESTIONNAIRE

1. NAME _____

2. AGE _____

3. PLACE OF BIRTH _____

4. CURRENT ADDRESS _____

5. COUNTY _____

6. DO YOU RENT OR OWN YOUR RESIDENCE? RENT _____ OWN _____

7. HOW LONG HAVE YOU LIVED AT THIS ADDRESS? _____

8. HOW LONG HAVE YOU RESIDED IN THE ATLANTA METROPOLITAN AREA? _____ IN WHAT OTHER CITIES, STATES AND COUNTRIES HAVE YOU RESIDED WITHIN THE LAST 10 YEARS?
 _____
 _____
 _____

9. IF NOT RESIDING WITH A SPOUSE, DO YOU LIVE WITH PARENTS/RELATIVES? Yes _____ No _____

10. PLEASE CHECK THE LEVELS OF EDUCATION COMPLETED:

 GRADE SCHOOL _____ JUNIOR HIGH _____

 HIGH SCHOOL _____ VOCATIONAL/TRADE SCHOOL _____

 COLLEGE _____ PROFESSIONAL SCHOOLS _____

 GRADUATE SCHOOL _____

11. IF A GRADUATE OF A COLLEGE OR VOCATIONAL SCHOOL, WHAT WAS YOUR MAJOR AREA OF STUDY OR TRAINING? _____
 _____

12. HAVE YOU EVER BEEN SELF–EMPLOYED? Yes _____ No _____

 IF YES, PLEASE DESCRIBE WHEN AND WHAT YOU DID WHILE SELF EMPLOYED: _____
 _____

13. LIST SIGNIFICANT EMPLOYMENT WITHIN THE PAST 10 YEARS. GIVE APPROXIMATE DATES. _____
 _____
 _____
 _____
 _____
 _____

14. MARITAL STATUS

 _____ NEVER MARRIED _____ MARRIED—

 _____ DIVORCED NUMBER OF YEARS _____

 _____ SEPARATED _____ WIDOWED

**1472** 

15. NUMBER OF CHILDREN (IF ANY): _____ GIRLS _____ BOYS

 AGES: _____

16. PLEASE LIST FOR EACH CHILD 18 YEARS OR OLDER:

| AGE | OCCUPATION | PLACE OF EMPLOYMENT | CITY OF RESIDENCE |
|-----|------------|---------------------|-------------------|
| | | | |
| | | | |
| | | | |
| | | | |

17. PLEASE LIST ORGANIZATIONS TO WHICH YOU OR YOUR SPOUSE BE-
 LONG OR IN WHICH EITHER OF YOU PARTICIPATE, EITHER NOW OR IN
 THE RECENT PAST. FOR EXAMPLE, RELIGIOUS, POLITICAL, SOCIAL,
 FRATERNAL, SERVICE, PROFESSIONAL, BUSINESS, SPORTING, RECRE-
 ATIONAL ORGANIZATIONS, AND UNION MEMBERSHIP.

18. ANY OFFICES HELD IN ABOVE ORGANIZATIONS: _____

19. IF YOU ARE AFFILIATED WITH A CHURCH, TEMPLE, SYNAGOGUE OR
 OTHER RELIGIOUS ORGANIZATION, PLEASE GIVE ITS NAME AND LOCA-
 TION: _____

20. DO YOU HAVE AN ACTIVE ROLE IN YOUR CHURCH?

 Yes _____ No _____

 IF YES, PLEASE EXPLAIN:

21. HAVE YOU EVER STUDIED FOR THE MINISTRY, PRIESTHOOD OR ANY
 OTHER RELIGIOUS POSITION? Yes _____ No _____

 IF SO, PLEASE EXPLAIN: _____

22. HAVE YOU OR YOUR SPOUSE EVER PARTICIPATED IN, OR CONTRIBUT-
 ED MONEY TO, ANY GROUP CONCERNED WITH CRIME PREVENTION OR
 VICTIMS' RIGHTS (SUCH AS CRIME STOPPERS, NEIGHBORHOOD WATCH
 PROGRAMS, SHELTERS OR CRISIS CENTERS)?

 Yes _____ No _____

IF SO, PLEASE DESCRIBE:

_____

_____

_____

23. WHAT NEWSPAPERS AND MAGAZINES DO YOU USUALLY READ?

_____

_____

24. LIST ANY NATIONAL OR LOCAL NEWS PROGRAMS YOU FREQUENTLY WATCH: _____

25. IF APPLICABLE, DO YOU HAVE ONE OR MORE FAVORITE RADIO STATIONS?

Yes ____ No ____ IF SO, WHICH ONES? _____

_____

26. DO YOU FREQUENTLY LISTEN TO ANY RADIO TALK SHOWS?

Yes ____ No ____ IF SO, WHICH ONES? _____

_____

_____

27. NAME THREE FAVORITE TELEVISION PROGRAMS THAT YOU REGULAR-LY WATCH: _____

28. PLEASE LIST THE TYPES OF BOOKS OR MOVIES YOU MOST ENJOY:

_____

_____

29. PLEASE LIST YOUR HOBBIES OR SPARE TIME ACTIVITIES:

_____

_____

30. HAVE YOU EVER OWNED ANY KIND OF FIREARM?

Yes ____ No ____

IF SO, WHAT TYPES OF FIREARM(S) HAVE YOU OWNED, AND FOR WHAT PURPOSES DO YOU (DID YOU) OWN THEM? _____

_____

31. HAVE YOU EVER BELONGED TO THE NATIONAL RIFLE ASSOCIATION, GUN OWNERS OF AMERICA OR ANY OTHER ORGANIZATION WHICH IS CONCERNED WITH PROTECTING THE RIGHT TO OWN WEAPONS?

Yes ____ No ____

IF SO, PLEASE DESCRIBE THE EXTENT OF YOUR PARTICIPATION IN THE ORGANIZATION: _____

_____

32. HAVE YOU EVER HAD BUMPER STICKER(S) ON YOUR CAR?
Yes _____ No _____ Not sure/can't remember _____

IF SO, WHAT DID THE BUMPER STICKER(S) SAY:
_____
_____

33. WOULD YOU DESCRIBE YOURSELF POLITICALLY? PICK THE SPOT ON THE SCALE WHICH SEEMS CORRECT:

1 2 3 4 5 6

Extremely liberal Extremely conservative

OR (CHECK IF APPLICABLE)

_____ NO OVERALL CLASSIFICATION FITS IN MY CASE

34. HAVE YOU EVER SERVED ON A GRAND JURY, EITHER FEDERAL OR STATE?

Yes _____ NO _____

IF YES, WHEN? _____

WAS IT FEDERAL OR STATE GRAND JURY?
_____ FEDERAL _____ STATE

35. HAVE YOU EVER SERVED AS A JUROR IN A CRIMINAL CASE?

_____ Yes _____ No

IF YES, PLEASE EXPLAIN, IF YOU REMEMBER, THE FOLLOWING FOR SUCH CASE:

YEAR _____ COURT: STATE _____ FEDERAL _____

TYPE OF CASE _____

DID THE JURY REACH A VERDICT? Yes _____ No _____

36. HAVE YOU OR ANY MEMBER OF YOUR IMMEDIATE FAMILY EVER BEEN THE VICTIM OF A CRIME OF VIOLENCE?

Yes _____ No _____

IF YES, WHEN? _____ WHERE? _____

WERE YOU PRESENT WHEN THE CRIME OCCURRED? _____

DESCRIBE WHAT HAPPENED: _____
_____
_____
_____
_____

WAS ANYONE ARRESTED? _____

37. IF YOU HAVE EVER BEEN CONVICTED OF A FELONY, DESCRIBE HOW YOUR PRIVILEGES TO SERVE ON A JURY WERE RESTORED:

_____

38. HAVE YOU OR ANYONE CLOSE TO YOU EVER BEEN THE VICTIM OF SERIOUS PHYSICAL VIOLENCE (DOMESTIC OR OTHERWISE)?

Yes ____ No ____

IF YES, EXPLAIN: _____
_____
_____
_____
_____
_____

39. HAS ANYONE CLOSE TO YOU BEEN THE VICTIM OF A HOMICIDE?

Yes ____ No ____

IF YES, EXPLAIN: _____
_____
_____
_____
_____
_____

40. HAVE YOU OR ANY MEMBER OF YOUR FAMILY EVER WORKED AT A CRISIS LINE, RAPE CRISIS CENTER, BATTERED WOMEN'S SHELTER OR SIMILAR PLACE, WHETHER AS A PAID EMPLOYEE OR A VOLUNTEER?

Yes ____ No ____

IF YES, PLEASE TELL U.S. WHEN AND WHERE: _____
_____

41. HAVE YOU OR ANY MEMBER OR YOUR IMMEDIATE FAMILY, OR FRIENDS EVER USED ANY OF THE ABOVE SERVICES?

Yes ____ No ____ IF YES, PLEASE EXPLAIN:

_____
_____
_____
_____

42. HAVE YOU HEARD OR READ ANYTHING ABOUT THIS CASE BEFORE NOW?
Yes ____ No ____ Maybe ____

IF YES OR MAYBE, PLEASE STATE WHAT YOU HEARD OR READ AND THE SOURCE:

_____
_____

43. HAS ANYONE EVER TALKED TO YOU ABOUT THE FACTS OF THIS CASE?

Yes ____ No ____

IF YES, PLEASE EXPLAIN: _____

_____

44. HAVE YOU FORMED ANY OPINION AS TO WHETHER THE DEFENDANT IN THIS CASE IS GUILTY OR NOT GUILTY?

Yes ____ No ____

IF YES, WHAT IS YOUR OPINION? _____

_____

45. IF YOU HAVE FORMED AN OPINION AS TO WHETHER THE DEFENDANT IS GUILTY OR NOT GUILTY, COULD YOU SET THAT OPINION ASIDE AND RETURN A VERDICT BASED ONLY ON THE EVIDENCE PRESENTED IN COURT? (PICK ONE ANSWER).

_____ YES, I DEFINITELY COULD

_____ I PROBABLY COULD

_____ NOT SURE

_____ I PROBABLY COULD NOT

_____ NO, I DEFINITELY COULD NOT

46. DO YOU THINK RACE DISCRIMINATION AGAINST AFRICAN AMERICANS IN THE UNITED STATES IS A PROBLEM? (PICK ONE ANSWER).

_____ YES, DEFINITELY A BIG PROBLEM

_____ YES, OFTEN A PROBLEM

_____ OCCASIONALLY A PROBLEM

_____ NOT SURE

_____ USUALLY NOT A REAL PROBLEM

_____ RARELY A PROBLEM

_____ NOT A PROBLEM AT ALL

ADD ANY COMMENTS YOU WISH. _____

_____

_____

47. DO YOU BELIEVE THAT AFRICAN AMERICANS ARE TOO DEMANDING IN THEIR PUSH FOR EQUAL RIGHTS?

_____ STRONGLY AGREE

_____ AGREE SOMEWHAT

_____ NO OPINION

_____ DISAGREE SOMEWHAT

_____ STRONGLY DISAGREE

*EXHIBIT A*—Continued

48. SHOULD THE LAW ALLOW A HOMEOWNER TO DECIDE FOR HIMSELF/ HERSELF WHETHER OR NOT TO SELL A HOUSE TO A RACIAL MINORITY?

 YES ＿＿ NO ＿＿ NOT SURE/NO OPINION ＿＿＿

 ADD ANY COMMENTS YOU WISH ＿＿＿＿＿＿＿＿＿＿＿＿＿＿

 ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

49. YOU OR YOUR SPOUSE BELONG TO ANY ORGANIZATIONS OR GROUPS THAT ARE CONCERNED WITH RACIAL ISSUES? (FOR EXAMPLE, A CIVIL RIGHTS ORGANIZATION). IF SO, PLEASE IDENTIFY THE ORGANIZATIONS OR GROUPS.

50. DO YOU OR YOUR SPOUSE BELONG TO ANY ORGANIZATION OR CLUB THAT LIMITS MEMBERSHIP ON THE BASIS OF RACE OR NATIONAL ORIGIN? IF SO, PLEASE IDENTIFY THE ORGANIZATION OR CLUB.

51. THE DEFENDANT IN THIS CASE IS AFRICAN AMERICAN AS WAS THE VICTIM OF THE CRIME. COULD YOU DETERMINE WHETHER OR NOT THE DEFENDANT IS GUILTY OF THE CRIME CHARGED WITHOUT CONSIDERING THE RACE OF EITHER THE DEFENDANT OR THE VICTIM?

 Yes ＿＿ No ＿＿

 IF NO, PLEASE EXPLAIN: ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

52. IF THE DEFENDANT IS CONVICTED, COULD YOU DETERMINE THE APPROPRIATE PENALTY WITHOUT CONSIDERING THE RACE OF EITHER THE DEFENDANT OR THE VICTIM?

 Yes ＿＿ No ＿＿

 IF NO, PLEASE EXPLAIN ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

53. DURING THE COURSE OF THIS TRIAL, YOU MAY HEAR TESTIMONY FROM PSYCHOLOGISTS OR PSYCHIATRISTS. WHAT IS YOUR OPINION ABOUT THE ABILITY OF PSYCHOLOGISTS OR PSYCHIATRISTS TO IDENTIFY AND EXPLAIN THE REASONS FOR HUMAN BEHAVIOR?

54. HAVE YOU OR ANY MEMBER OF YOUR IMMEDIATE FAMILY EVER WORKED FOR A PSYCHIATRIST, PSYCHOLOGIST, THERAPIST, MENTAL HEALTH COUNSELOR, AT A MENTAL HEALTH CLINIC OR PSYCHIATRIC HOSPITAL OR SIMILAR SETTING?

 Yes ＿＿ No ＿＿

IF YES, PLEASE DESCRIBE: _____

_____

_____

_____

55. HAVE YOU EVER RECEIVED ANY TRAINING OR ENGAGED IN THE STUDY OF PSYCHOLOGY OR PSYCHIATRY?

Yes _____ No _____

IF SO, PLEASE EXPLAIN: _____

56. HAVE YOU OR ANY MEMBER OF YOUR IMMEDIATE FAMILY EVER BEEN HOSPITALIZED FOR MENTAL ILLNESS?

Yes _____ No _____

IF SO, PLEASE EXPLAIN INCLUDING HOW LONG, WHEN AND IF IT WAS MORE THAN ONE TIME:

_____

_____

57. IF YOU WERE ON THE JURY IN THIS CASE AND THE DEFENDANT WAS CONVICTED OF MURDER WITHOUT LEGAL JUSTIFICATION, WHICH OF THE FOLLOWING WOULD YOU DO IN DETERMINING WHETHER OR NOT THE DEATH PENALTY SHOULD BE IMPOSED? (CHECK ONE)

_____ I WOULD MAKE MY DECISION BASED ON CONSIDERATION OF THE EVIDENCE IN THIS PARTICULAR CASE, INCLUDING EVIDENCE OF AGGRAVATING OR MITIGATING CIRCUMSTANCES, AND IN ACCORDANCE WITH THE COURT'S INSTRUCTIONS ON THE LAW.

_____ I WOULD AUTOMATICALLY VOTE IN FAVOR OF THE DEATH PENALTY.

_____ I WOULD AUTOMATICALLY VOTE AGAINST THE DEATH PENALTY.

ADD ANY COMMENTS YOU WISH. _____

_____

58. WOULD YOU FAVOR ABOLISHING THE DEATH PENALTY? (PICK ONE ANSWER).

_____ YES, DEFINITELY

_____ PROBABLY SO

_____ NOT SURE

_____ PROBABLY NOT

_____ DEFINITELY NOT

ADD ANY COMMENTS YOU WISH: _____

_____

_____

_____

59. WHICH OF THE FOLLOWING DESCRIBES YOUR ATTITUDE TOWARD THE DEATH PENALTY? (YOU CAN CHECK AS MANY OR AS FEW AS APPLY TO YOU):

_____ THE DEATH PENALTY IS ACCEPTABLE, BUT IT SHOULD BE IMPOSED IN FEWER CASES THAN IT IS.

_____ THE DEATH PENALTY SHOULD PROBABLY BE IMPOSED MORE FREQUENTLY THAN IT IS.

_____ THE DEATH PENALTY TYPICALLY IS IMPOSED IN APPROPRIATE CASES.

_____ THE DEATH PENALTY SHOULD BE ABOLISHED BECAUSE IT IS WRONG.

_____ ONCE THE DEATH PENALTY IS IMPOSED, COURTS SHOULD ENFORCE IT MORE PROMPTLY THAN THEY DO.

_____ I AM UNCERTAIN HOW I FEEL ABOUT THE DEATH PENALTY.

ADD ANY COMMENTS YOU WISH: _____
_____
_____
_____
_____

60. DOES YOUR SPOUSE HAVE A DIFFERENT OPINION OF THE DEATH PENALTY FROM YOURS?

_____ YES

_____ NO

_____ NOT SURE

_____ NOT APPLICABLE

IF YOU ANSWERED "YES," WHAT IS YOUR SPOUSE'S OPINION?
_____

61. IF YOU FAVOR THE DEATH PENALTY, WOULD YOU SAY YOU FAVOR IT:

_____ VERY STRONGLY

_____ SOMEWHAT STRONGLY

_____ NOT VERY STRONGLY AT ALL

_____ OTHER

ADD ANY COMMENTS YOU WISH _____
_____
_____

62. IF YOU OPPOSE THE DEATH PENALTY, WOULD YOU SAY THAT YOU:

_____ COULD NOT SUPPORT THE DEATH PENALTY IN ANY CASE

_____ MIGHT SOMETIMES SUPPORT THE DEATH PENALTY IN THE MOST HORRIBLE CASES

ADD ANY COMMENTS YOU WISH _____
_____
_____

63. IN YOUR OPINION, WHAT REASONS JUSTIFY THE DEATH PENALTY? (YOU CAN PICK AS MANY ANSWERS AS YOU THINK APPLY):

_____ PUNISHING PEOPLE

_____ PROTECTING SOCIETY

_____ SENDING A MESSAGE TO OTHERS WHO MIGHT COMMIT MURDER

_____ THERE IS NO GOOD REASON FOR THE DEATH PENALTY

JUROR'S OATH

I DECLARE UNDER PENALTY OF PERJURY THAT THE INFORMATION WHICH I HAVE PROVIDED IN THIS JURY QUESTIONNAIRE IS TRUE AND CORRECT.

_____ _____
DATE JUROR SIGNATURE

Exhibit B

## SPECIAL FINDINGS

### INITIAL FINDING

Does the jury unanimously find beyond a reasonable doubt that at least one of the following applies in this case?

(A) The Defendant, Anthony George Battle, intentionally killed the victim, D'Antonio Washington

(B) The Defendant intentionally inflicted serious bodily injury that resulted in the death of the victim

(C) The Defendant intentionally and specifically engaged in conduct intending that the life of a person would be taken or that lethal force would be used, and the victim died as a result of the act.

Yes __✓__ No ____

**NOTE: IF YOUR ANSWER IS "NO," PROCEED NO FURTHER. GO TO THE END OF THE FORM AND SIGN IT. IF YOUR ANSWER IS "YES," GO ON TO THE NEXT SECTION.**
**FINDINGS WITH RESPECT TO AGGRAVATING AND MITIGATING FACTORS**

Aggravating Factors

1. Does the jury unanimously find beyond a reasonable doubt that the Defendant was previously convicted of another federal or state offense resulting in the death of a person, for which either a sentence of life imprisonment or a sentence of death was authorized?

Yes __✓__ No ____

2. Does the jury unanimously find beyond a reasonable doubt that the Defendant committed the instant offense in an especially heinous, cruel or depraved manner in that it involved serious physical abuse to the victim?

Yes __✓__ No ____

3. Does the jury unanimously find beyond a reasonable doubt that the Defendant murdered an employee of a United States penal or correctional institution while the employee was engaged in the performance of his duties?

Yes __✓__ No ____

**NOTE: IF YOU HAVE ANSWERED "NO" TO ALL OF QUESTIONS 1, 2 AND 3 ON THIS PAGE, PROCEED NO FURTHER. GO TO THE END OF THE FORM AND SIGN IT. IF ANY OR ALL OF QUESTIONS 1, 2 AND 3 HAVE BEEN ANSWERED "YES" GO TO THE NEXT QUESTION.**

4. Does the jury unanimously find beyond a reasonable doubt that the Defendant has a low potential for rehabilitation and that he is a danger to the lives and safety of other persons?

Yes __✓__ No ____

5. Does the jury unanimously find beyond a reasonable doubt that the Defendant caused harm to the family of D'Antonio Washington as a result of the killing?

Yes __✓__ No ____

Mitigating Factors

1. Do one or more members of the jury find by a preponderance of the evidence that the Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, even though not so impaired as to constitute a defense to the charge?

Yes __✓__ No ____

2. Do one or more members of the jury find by a preponderance of the evidence that the Defendant committed the offense under severe mental or emotional disturbance?

Yes __✓__ No ____

3. Do one or more members of the jury find by a preponderance of the evidence that the Defendant was under unusual or substantial duress, even though not of such a degree as to constitute a defense to the charge?

Yes __✓__ No ____

4. Do one or more members of the jury find by a preponderance of the evidence that there are factors in the Defendant's background, record, or character that weigh against imposition of the death penalty?

Yes __✓__ No _____

5. Do one or more members of the jury find by a preponderance of the evidence that any circumstance of the offense not previously mentioned weighs against imposition of the death penalty?

Yes _____ No __✓__

If yes specify such circumstance(s) _____

_____

_____

_____

_____

6. Do one or more members of the jury find by a preponderance of the evidence that there is/are any mitigating circumstance(s) not specifically set forth?

Yes _____ No __✓__

If yes, specify any such factor(s) _____

_____

_____

_____

_____

_____

_____

_____

_____

## UNDERSTANDING

We understand that we are to consider whether the aggravating factors unanimously found by us to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. We also understand that a finding with respect to a mitigating factor may be made by any one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established for purposes of his or her weighing of the aggravating factors and mitigating factors regardless of the number of jurors who concur that the factor has been established. We also understand that a jury is never required to impose a death sentence and that a sentence of death cannot be imposed except by unanimous vote.

## SENTENCING DETERMINATION

We the jury have unanimously determined that the death penalty should be imposed. (Note that if any members of the jury do not find that the death penalty should be imposed, you would check "No" and a nonparoleable life sentence would be imposed.)

YES __✓__ NO_____

*[signatures]*

FOREPERSON

## CERTIFICATE

By signing below, each of us individually hereby certifies that consideration of the race, color, religious beliefs, national origin or sex of Defendant Anthony George Battle and of the victim D'Antonio Washington were not involved in reaching our respective individual decisions. Each of us further individually certifies that the same determination regarding the sentence for the crime in question would have been made no matter what the race, color, religious beliefs, national origin or sex of Defendant Anthony George Battle and of D'Antonio Washington.